# IN THE SUPREME COURT OF IOWA

No. 14–0284

Filed December 4, 2015

Amended February 12, 2016

**STATE OF IOWA,**

    Appellee,

vs.

**ANDREW JAMES LOPEZ,**

    Appellant.

___

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Story County, Steven P. Van Marel, District Associate Judge.

Defendant seeks resentencing based on the prosecutor's alleged breach of a plea agreement. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT SENTENCE VACATED; CASE REMANDED FOR RESENTENCING.**

Mark C. Smith, State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant Attorney General, Stephen Holmes, County Attorney, and Tiffany Meredith, Assistant County Attorney, for appellee.

**WATERMAN, Justice.**

Most criminal cases are resolved through guilty pleas resulting from plea bargains negotiated by defense counsel and the prosecution.[1] Our precedent makes clear that prosecutors are required to scrupulously honor the letter and spirit of plea agreements to maintain the integrity of the plea-bargaining process. We must determine whether the prosecutor in this case, who recited the plea agreement verbatim to recommend a deferred judgment and probation without mentioning tougher sentences, nevertheless breached that agreement by her actions at the sentencing hearing. Specifically, without objection by defense counsel, the prosecutor introduced photographs of the child-victim's injuries and used them on cross-examination of the defendant's witnesses to assert what the defendant did was "pretty horrible" and to imply the defendant remained a threat to small children. Moreover, both the victim's father and the guardian ad litem (GAL), who had been appointed in a related juvenile court proceeding, gave victim-impact statements urging incarceration, again without objection. The district court imposed a five-year prison sentence. On appeal, the defendant contends he received ineffective assistance of counsel and is entitled to resentencing. The court of appeals disagreed and affirmed.

On further review, we hold the district court can receive victim-impact statements from both the child-victim's father and the GAL,

---

[1]"An estimated ninety-five percent of convictions are secured through the plea-bargaining process." *State v. Fannon*, 799 N.W.2d 515, 520 n.2 (Iowa 2011) (citing Michael M. O'Hear, *Plea Bargaining & Procedural Justice*, 42 Ga. L. Rev. 407, 409 (2008)). "[C]riminal justice today is for the most part a system of pleas, not a system of trials." *Lafler v. Cooper*, 566 U.S. ___, ___, 132 S. Ct. 1376, 1388, 182 L. Ed. 2d 398, 411 (2012). "In the vast majority of criminal cases, a prosecutor's promise of less harsh treatment induces the defendant to waive his constitutional rights and admit guilt." *United States v. Heredia*, 768 F.3d 1220, 1230 (9th Cir. 2014).

provided the GAL was properly designated and her statement was not solicited by the prosecutor to undercut the State's sentencing recommendation. We further hold the prosecutor breached the plea agreement by gratuitously introducing photos not otherwise before the court and using those photos on cross-examination to signal the defendant deserved incarceration rather than probation. Accordingly, we vacate the decision of the court of appeals and the district court's sentence, and we remand for resentencing by a different judge.

## I. Background Facts and Proceedings.

In September of 2013, the defendant, Andrew Lopez, age twenty, lived in Boone, Iowa, with his girlfriend, Tayler Hershey and two children, their one-year-old daughter, A.L., and Hershey's son from a prior relationship, B.H., age two. On the morning of September 18, Hershey asked Lopez to watch the toddlers while she went to work. When Hershey returned that afternoon, she noticed bruises on B.H.'s neck, face, and back; a bite mark; and a burn below his diaper line. Hershey confronted Lopez about B.H.'s injuries. Lopez told her B.H. had fallen off the bed, and the burn was caused by "magical fire." Hershey removed both children from their apartment and took B.H. to the hospital. The emergency room physician documented the injuries and contacted the Iowa Department of Human Services (DHS) to report child abuse.

On October 7, Special Agent Scott Peasley of the Iowa Division of Criminal Investigation interviewed Lopez. Lopez initially denied causing any of B.H.'s injuries. Lopez admitted that both children were scared of him and that B.H. often cried when he saw Lopez. Lopez asserted the children disliked him because he was the disciplinarian in the home. Lopez claimed he had never hurt B.H. During the interview, Lopez characterized the burn below B.H.'s diaper as a "small blister." When

told it was a burn, Lopez responded the only way he could have caused it was by ash accidentally falling from his cigarette as he changed B.H.'s diaper. Lopez ultimately admitted that he probably caused some of the bruises by yanking B.H. around while trying to discipline him.

On November 1, Lopez was charged with willful injury in violation of Iowa Code section 708.4(2) (2013). The State amended the trial information on December 9 to charge Lopez with child endangerment in violation of Iowa Code sections 726.6(1)(*a*) and/or 726.6(1)(*b*), and section 726.6(6). On December 17, the parties filed a pretrial report stating that Lopez and the State had reached the following plea agreement:

> Defendant to plead guilty as charged to Child Endangerment causing Bodily Injury (Class D) with a joint recommendation for a deferred judgment; Requesting that defendant be placed on probation to the Department of Corrections for a term not to exceed 2 years, and while on probation pay the minimum fines, court costs, surcharges, restitution, court appointed attorney's fees, probation fees, jail room and board fees, and complete a parenting class, anger management class, and a mental health evaluation. Defendant to promptly follow through with the recommendations of the mental health evaluation if any treatment is recommended, and to file proof of completion of the anger management and parenting courses. A No contact order regarding the victim (B.H.) and his mother enter for a period of 5 years. A No contact order regarding the victim's sister (A.L.) to enter for 5 years and with the provision that visits be allowed at the discretion of the Department of Human Services. Credit for time served on jail sentence as well.

On December 30, pursuant to this plea agreement, Lopez pled guilty to child endangerment causing bodily injury, in violation of Iowa Code sections 726.6(1) and 726.6(6). At the plea hearing, Lopez admitted he had bruised B.H.'s neck. Lopez explained, "I was having a bad day, and I was all upset and mad at the kids because they were hopping around and not listening, and I was grabbing them too hard and bringing

them back up on the bed." Lopez said the burn on B.H.'s abdomen was unintentionally caused by ash falling from his cigarette while he was changing B.H.'s diaper.

The prosecutor recited the plea agreement on the record. The district court requested clarification regarding the no-contact orders for B.H. and A.L. The prosecutor explained the family relationships between Lopez, B.H., and A.L. The prosecutor also informed the court that A.L. was involved in a contested adjudication with the DHS. The district court accepted Lopez's guilty plea.

A presentence investigation report (PSI) was filed on February 10, 2014. The report noted that Lopez and Hershey were still in a relationship and set forth what Lopez told the investigator happened to B.H.:

> When watching Tayler['s] and [my] children at our apartment . . . , I was angry and used excessive force in grabbing [B.H.], Tayler's son. I had no reason to be so forceful, and he didn't deserve to be negatively impacted due to my attitude that day. I let my anger cause me to do something stupid and I fully regret my emotion that day. Making mistakes isn't something I make a habit of doing. This was a terrible act. Violence is not something I condone.

The report placed Lopez at the high-moderate range of risk to reoffend due to the nature of the offense, a prior probation revocation, and his sporadic employment history. The report expressed concern regarding Lopez's living situation during probation because he had been living with Hershey. The PSI recommended a five-year suspended prison sentence, with probation contingent on Lopez's placement in a halfway house. The PSI also recommended Lopez attend anger management and parenting classes.

On February 10, Brad Deshong, B.H.'s biological father, submitted a written victim-impact statement. Deshong said he was afraid he could

not adequately protect his child when Lopez was released from jail. Deshong had trouble sleeping at night and had nightmares about B.H. reaching out for help. Deshong asked that Lopez receive the maximum jail time.

Lopez's sentencing hearing took place on February 13 with the same judge who presided at Lopez's plea hearing. The prosecutor offered into evidence two photographs showing B.H.'s injuries. These photos had not been in the court file or available to the judge previously. After the sentencing court admitted the photographs without objection, the prosecutor stated, "Your Honor, there is no other evidence, but there are two individuals that would like to make an impact statement today." This colloquy followed:

> THE COURT: Why don't you have them step up.
>
> MS. MEREDITH: Your Honor, the first one would be Brad Deshong, the father of the child.
>
> THE COURT: Step up to the witness stand. Go ahead and have a seat. Would you state your name for the court reporter and spell your last name, then you may read your statement.

Deshong, who was not placed under oath, gave the following statement:

> On September 18th, 2013, you committed an act of torture on my little boy [B.H.]. As a result of this my little boy suffered several injuries. You say this occurred when a child fell off the bed. I say that's bogus. You bit him, bruised him on his face and shoulders, and his back. Also left behind was a perfectly round wound on his lower abdomen from when you took your lit cigarette and pressed it into his skin, burning the flesh. These are just some examples of what I know you did to him.
>
> My little boy should have been peacefully sleeping that night. He was in an emergency [room] at two different hospitals, not only being poked and prodded at, but also having several pictures taken, as well as hours of x-rays, to make sure you didn't break any of his bones during the abuse.

At first I wanted to find you and do the same thing to you as you did to my child. In the immediate days following after the abuse I was sick to my stomach for days. I didn't sleep, and when I did, all I could do is vision you abusing [B.H.], vision him crying out for help but unable to say the words because of his age. That still bothers me to this day, wondering how something like this could happen.

But it's obvious to me what happened, you say you didn't get along with my son. How a mature, sane adult doesn't get along with a two-year-old is beyond me, a 2-year-old, let alone commit such a heartless act of violence on a child. [B.H.] remembers what you did to him. There are times he has pulled down on the front of his pants, pointing at the scar on his lower abdomen, calling it his "owee". To me it's plain and simple, if you didn't like my son all you had to do was stay away from him.

In the future I will continue to strive to keep my son safe, safe from sick people like you. I will never forget or forgive what you have done. I can only hope that the punishment is to the maximum extent. It's what you deserve in the very least.

Defense counsel made no objection to Deshong's statement. Deshong's statement was followed by this colloquy:

THE COURT: All right. You may step down. And you may have your next witness step up.

MS. MEREDITH: Your Honor, the next person would be Shannon Leighty, the guardian *ad litem*, representing the child in the juvenile matters.

THE COURT: All right. Ms. Leighty, you may be seated and make your statement.

Leighty, who was not placed under oath, gave this statement:

I'm the guardian *ad litem* appointed to the child in the juvenile matter. Normally I don't get involved in the criminal matters. I've been an attorney for about 13 years, and this is actually the first time I've ever come into court to make a statement. However, in this case I couldn't remain silent as the child needs a voice.

. . . I don't believe that Mr. Lopez deserves a deferred judgement. I attended the guilty plea hearing hoping to hear if Mr. Lopez would take responsibility for his actions. Instead I heard excuses, I heard him minimize his actions.

Mr. Lopez needs to have anger management classes, a mental health evaluation, and parenting classes. I believe

that a no contact order needs to be extended for an additional five years. It's my understanding that one wasn't imposed, so I would ask that one be imposed for that time period.

It's very unlikely that the child would be protected if Mr. Lopez is on probation rather than in custody. In this matter the child is very young. He's only two years of age, he won't be three until next[] month, and he's not able to protect himself. I'm very concerned that if Mr. Lopez is around the child again, that further injuries will occur.

The child still remembers the abuse and will tell you "owee". At this point he is even too young to start therapy. He has to be three in order to do play therapy, so that will not start until next month. So he hasn't been able to start to address his issues and concerns. I have not made any request for restitution, and this is all I have to say at this point. Thank you.

Defense counsel made no objection to Leighty's statement. This colloquy followed:

THE COURT: Thank you. You may step down. Any further evidence by the state?

MS. MEREDITH: No, Your Honor.

Next, Lopez testified and presented testimony from four witnesses, all of whom were placed under oath. Lopez testified he understood that he needed anger management class, a mental health evaluation, and a parenting class. Lopez asked for a sentence that would allow him to visit and support A.L. and work while the juvenile case went forward. The prosecutor did not cross-examine Lopez.

Lopez then called his friend, Sheldon Whitmer, to the stand. Whitmer testified he was willing to provide housing for Lopez if Lopez was released on probation. Whitmer intended to "make sure [Lopez] goes to every appointment" and otherwise help him comply with the terms of his probation. Whitmer testified he lived with his son and fiancée. The prosecutor cross-examined Whitmer by using the photographs of B.H.'s injuries:

Q. Have you ever seen photographs of what Andrew did? A. No, I did not.

. . . .

Q. Sir, I'm going to show you State's Exhibits 1 and 2. It's pretty horrible to do to a little 2-year-old, isn't it? A. Yeah.

Q. Is it worse than what you thought had happened? A. A little bit, I never saw the pictures really. I tried not to believe it was him.

Q. So he still to this day has not actually admitted or talked to you about what happened? A. No, not really.

Q. Do you now have more concerns about Andrew? A. No.

Q. You think you can still have him come to your home and keep your children safe around him? A. Yes.

Q. And what would you do to ensure that the children that are in your home are safe and he would not have this problem again? A. Well, my fiancée is a stay-at-home mom, and like I said, he's always in a good mood when he's around me. I've never seen him lose his temper. I've never seen him even get mad.

Q. So is it fair to say there may be a side of him you haven't seen or ever had the chance to encounter yet? A. Yes.

Q. And you'd be able to ensure that that side doesn't come out and he works through his issues? A. Yes.

Lopez's attorney made no objections during this cross-examination.

Lopez then called Shalene Finley, Whitmer's fiancée. Finley testified she had known Lopez for four years. Finley understood the proposed terms of his probation and believed Lopez could comply. Finley confirmed that she was a stay-at-home mom and had no concerns about Lopez being around her child. The prosecutor cross-examined Finley about whether she had seen the photographs of B.H.'s injuries:

Q. Ma'am, have you seen the pictures? A. I have, Megan and Taylor actually sent them to me.

Q. And so you're aware of what happened that night and what was going on that night? A. Yes.

Lopez's attorney did not object to this cross-examination.

Lopez's third witness was Amber Lopez, his stepmother. Amber described Lopez as loving, funny, and affectionate towards his family. Amber understood the plea agreement and the classes and evaluations involved in the proposed probation terms. Amber believed the criminal charge had been "an eye opener for him" that would teach him to do better. She expressed confidence in Lopez's ability to complete the probation terms and vowed to support him through the process. The prosecutor cross-examined Amber about her knowledge of B.H.'s injuries:

> Q. Have you seen the pictures of what happened that night? A. No.
>
> . . . .
>
> Q. I'd like you to take a look at Exhibits 1 and 2. At this point in time has Andrew talked to you about what happened that night? A. No.
>
> Q. Is that what you would expect to have happened that night or is it better or worse? A. I—Ms. Voss-Orr described it to me, so, of course, I could never imagine anything like that, but—
>
> Q. Thank you. Nothing further, Your Honor.

Lopez's attorney did not object to this cross-examination.

Lopez's final witness was his father, Danny Lopez. Danny told the court that Lopez was generally a good person but could get emotional sometimes. Danny understood the elements of the plea agreement, and he believed Lopez could successfully complete the requirements. Danny explained that he believed Lopez "finally understood that playtime's over, that he's got to get his life straight, and if he doesn't he's going to spend time in jail or prison." He believed probation would give Lopez an opportunity to get help for Lopez's "anger issues." The prosecutor cross-examined Danny regarding his knowledge of B.H.'s injuries and Lopez's anger issues:

Q. Mr. Lopez, you said that he needs help or this would help him deal with his anger issues; correct? A. Yes.

Q. Does he have anger issues? A. Well, seeing these pictures up here, it would seem so, yes.

Q. And had you ever seen those pictures before? A. No, I have not.

Q. Does it cause you concern that your son could do that to a two-year-old? A. Yes.

Q. Have you ever seen anger issues in him before that day? A. I've seen plenty of anger issues but nothing to where I would ever think that this could happen.

Q. So is it fair to say that those pictures are kind of shocking to you? A. Yes, we have a young child at home.

Lopez's attorney did not object to this cross-examination.

The prosecutor accurately recited the plea agreement after the testimony from Lopez's witnesses:

> May it please the Court, Your Honor. Your Honor, in this case the State is jointly recommending a deferred judgment on this case. We are recommending that he be imposed with the minimum fines, court costs, and surcharges and attorney's fees. He pay the jail costs and probationary costs. That he be placed on probation for the minimum amount of time allowed by the law with the Department of Corrections. That while he's on probation he attend a parenting class and complete it and file proof of completion of that with the court. That he also complete an anger management course and file proof of completion of that with the court, and that he obtain a mental health evaluation, follow through with any recommended treatment.

> There is an agreement, Your Honor, in this case for three separate no contact orders to enter. The first would be with the young child . . ., B.H., and that . . . would be entered for a period of time of five years. That a no contact order regarding his mother, Taylor Hershey, also enter. That is the child's primary caretaker. We are asking that a no contact order regarding . . . A.L., Your Honor, be entered, and that one be different in allowing him to have visitation with his daughter at the discretion of the Department of Human Services, but due to her young age, we feel it is also appropriate in this case, Your Honor.

The prosecutor never overtly advocated for a tougher sentence or mentioned incarceration as an alternative to probation. Nor did the

prosecutor refer to the PSI report recommending Lopez be placed in a halfway house.

Lopez's counsel agreed with the State's recitation of the plea agreement and emphasized that the State and defense were jointly recommending probation with several no-contact orders. Lopez's counsel argued the unwavering support expressed by Lopez's witnesses at sentencing weighed against placing Lopez in a halfway house. Lopez's counsel said Lopez understood that his visits with A.L. would be contingent on his compliance with the probation requirements and argued the juvenile court proceedings for placement of A.L. would motivate Lopez to comply. She argued Lopez would do anything to "repair things with [A.L.], [to] make the changes he needs to make in order to become the parent he wants to be." Finally, Lopez's counsel argued that Lopez had taken ownership of his actions, cooperated with investigators, and expressed remorse for his actions. Lopez's trial counsel never argued the State breached its plea agreement.

The sentencing court did not follow the parties' joint sentencing recommendation. Rather, the court sentenced Lopez for an indeterminate prison term of up to five years, with credit for time served in jail, and imposed a $750 fine plus costs and surcharges. In addition, the court entered five-year no-contact orders regarding B.H., A.L., and Hershey. The no-contact order with A.L. permitted visitation as monitored by the DHS. The court gave these reasons for its sentence:

> Mr. Lopez, I think in order to be successful this sentence needs to make you understand how totally and completely unacceptable your behavior was. No matter what the circumstances, you never, ever, have the right to assault a 2-year-old, and when you do there are going to be serious consequences, and you need to understand, the community needs to understand, your family needs to understand, and

the victim's family needs to understand, how seriously this Court treats assault offenses.

Mr. Lopez, I can tell you right now you are not getting a deferred judgment. That's not an issue. The issue here is: Do you get probation or do you go to prison? These are the two alternative sentences, not a deferred judgment. You got a deferred judgment on an OWI, you were found in contempt because you violated probation, you kept your deferred, and now you're in court again on a much more serious charge. Obviously a deferred judgment probation did not rehabilitate you because you ended up committing a much more serious criminal offense after having completed your probation.

When I look at this case . . . I have some real concerns about the safety of our community if you are released into the community. *I have some real concerns about your ability to be able to control your temper and not do this again.* You have to understand here . . . that your actions now have affected probably forever the lives of a lot of people. Obviously they have affected the life of the victim, and his family, to a lesser degree. You have affected the lives of your family and yourself.

When I look at the sentencing options available here . . . I don't think probation at this point in your life is appropriate. Probation didn't work before. *You committed a very serious assault offense against a 2-year-old and you . . . cannot be trusted in the community on street probation or even a residential facility.* You are going to prison, and I think that is the only appropriate sentence here.

(Emphasis added.)

Lopez appealed, and we transferred the case to the court of appeals. Lopez argued the prosecutor's use of two victim-impact statements and the photographs during the sentencing phase breached the plea agreement. Lopez asserted he received ineffective assistance of counsel at the sentencing hearing because his attorney failed to object to the prosecutor's breach. The court of appeals affirmed Lopez's conviction and sentence. The court of appeals concluded there was no breach of the plea agreement because the agreement was accurately recited by the prosecutor at the sentencing hearing and the evidence and victim statements were permissible. Accordingly, the court of appeals rejected Lopez's claim of ineffective assistance of counsel.

We granted Lopez's application for further review.

## II. Standard of Review.

We review de novo claims of ineffective assistance of counsel arising from the failure to object to the alleged breach of a plea agreement. *State v. Bearse*, 748 N.W.2d 211, 214 (Iowa 2008).

## III. Analysis.

This case requires us to revisit the boundaries of a prosecutor's duty to honor a plea agreement's sentencing recommendation. Specifically, we must determine whether the prosecutor, who correctly recited the terms of the plea bargain and sentencing recommendation and stopped short of affirmatively arguing for a tougher sentence, nevertheless breached the agreement by eliciting adverse evidence supporting incarceration. We must also decide whether the district court properly accepted victim-impact statements from both the child-victim's father and the GAL. We begin our analysis by addressing how the context of this case—claimed ineffective assistance of trial counsel—frames our analysis. Next, we provide an overview of the importance of plea-bargaining and the key precedent on judicial enforcement of plea agreements. Against that backdrop, we decide the fighting issues: whether the plea agreement was breached by the presentation of the victim-impact statements or by the prosecutor's introduction and use of the photographs of the child-victim's injuries during cross-examination at the sentencing hearing.

**A. The Ineffective-Assistance-of-Counsel Claim.** Defense counsel made no objection at the sentencing hearing to the GAL's victim-impact statement or to the prosecutor's use of the photographs that allegedly breached the plea agreement. On appeal, Lopez argues he received ineffective assistance of counsel at sentencing. To prevail on an

ineffective-assistance-of-counsel claim, Lopez must show "(1) trial counsel failed to perform an essential duty; and (2) this omission resulted in prejudice." *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003); *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984). "Although claims of ineffective assistance of counsel are generally preserved for postconviction relief hearings, we will consider such claims on direct appeal where the record is adequate." *State v. Horness*, 600 N.W.2d 294, 297 (Iowa 1999). Here, both parties concur the record is adequate to resolve Lopez's claims on direct appeal, and we agree.

We presume defense counsel acted competently. *Id.* at 298. Counsel does not fail to perform an essential duty by failing to raise a meritless objection. *Id.* However, "defense counsel has a duty to object to [a] breach of a plea agreement." *Bearse*, 748 N.W.2d at 217. Therefore, the outcome of Lopez's appeal turns on whether the prosecutor breached the plea agreement. If the prosecutor honored the plea agreement, Lopez's trial counsel had no duty to object. Conversely, if the prosecutor breached the plea agreement, Lopez's trial counsel was duty-bound to object.

For most ineffective-assistance-of-counsel claims, the court may consider either the prejudice prong or breach of duty first, and failure to find either one will preclude relief. *See King v. State*, 797 N.W.2d 565, 571 (Iowa 2011). Prejudice is generally found only if " 'but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Graves*, 668 N.W.2d at 882 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct at 2068, 80 L. Ed. 2d at 698). However, we have modified the prejudice prong when the defendant alleges his counsel has been ineffective by failing to object to a breach of a plea agreement. *Bearse*,

748 N.W.2d at 217 (declining to speculate what sentence the district court would have imposed). The defendant "need not establish that, ' "but for his counsel's failure to object, he would have received a different sentence." ' " *State v. Fannon*, 799 N.W.2d 515, 523 (Iowa 2011) (quoting *Bearse*, 748 N.W.2d at 217). In *Horness*, we explained our deviation from the traditional prejudice standard:

> A proper objection by the defendant's attorney would have alerted the sentencing court to the prosecutor's breach of the plea agreement. In that circumstance, the court would have allowed the defendant to withdraw his guilty plea[], or would have scheduled a new sentencing hearing at which time the prosecutor could make the promised recommendations. The outcome of the defendant's proceeding was different, however, because defense counsel did not make the necessary objection. Consequently, the defendant was sentenced by the court at a hearing tainted by the prosecutor's improper comments.

*Horness*, 600 N.W.2d at 301 (citation omitted); *accord Strickland*, 466 U.S. at 692, 104 S. Ct. at 2067, 80 L. Ed. 2d at 696 ("In certain Sixth Amendment contexts, prejudice is presumed.").[2] We decline to play mind reader to speculate on what the sentencing court would have done differently if trial counsel had objected to a breach of the plea agreement. We hold that prejudice is presumed when defense counsel fails to object to the state's breach of a plea agreement at the sentencing hearing.

---

[2]Other courts have declined to require the defendant to show prejudice resulting from defense counsel's failure to object to the state's breach of a plea agreement. *State v. Gonzalez-Faguaga*, 662 N.W.2d 581, 590 (Neb. 2003) ("Instead, the focus is on whether counsel's deficient performance sacrificed Gonzalez-Faguaga's ability to protect the bargain he had struck with the State, thereby rendering the result of the proceedings 'fundamentally unfair.' "); *Baldridge v. Weber*, 746 N.W.2d 12, 20 (S.D. 2008) (" 'In order to preserve the integrity of plea bargaining procedures and public confidence in the criminal justice system, a petitioner is generally entitled to the enforcement of a plea agreement without showing a tangible harm resulting from that breach.' " (quoting *United States v. Vaval*, 404 F.3d 144, 155 (2d Cir. 2005))); *State v. Smith*, 558 N.W.2d 379, 388 (Wis. 1997) ("[A] breach of the State's agreement on sentencing is a 'manifest injustice' and always results in prejudice to the defendant.").

We next discuss the key precedent on the enforcement of plea agreements to put the issues in this case in proper context.

**B. The Importance of Judicial Enforcement of Plea Agreements.** In *Santobello v. New York,* the United States Supreme Court emphasized the importance of plea agreements in our criminal justice system:

> The disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called "plea bargaining," is an essential component of the administration of justice. Properly administered, it is to be encouraged. If every criminal charge were subjected to a full-scale trial, the States and the Federal Government would need to multiply by many times the number of judges and court facilities.
>
> Disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons. It leads to prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pre-trial confinement for those denied release pending trial; . . . and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned.

404 U.S. 257, 260–61, 92 S. Ct. 495, 498, 30 L. Ed. 2d 427, 432 (1971). The Supreme Court emphasized that "all of these considerations presuppose fairness in securing agreement between an accused and a prosecutor." *Id.* at 261, 92 S. Ct. at 498, 30 L. Ed. 2d at 432. Thus, "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration [for the plea], such promise must be fulfilled." *Id.* at 262, 92 S. Ct. at 499, 30 L. Ed. 2d at 433.

The prosecutor's promise that induced the guilty plea in *Santobello* was not fulfilled. In that case, the defendant was charged with two gambling-related felonies. *Id.* at 258, 92 S. Ct. at 497, 30 L. Ed. 2d at

430. Plea negotiations resulted in his guilty plea to a single, lesser charge, with the prosecutor agreeing "to make no recommendation as to the sentence." *Id.* at 258, 92 S. Ct. at 497, 30 L. Ed. 2d at 431. A new prosecutor at the sentencing hearing recommended the court impose the maximum one-year sentence. *Id.* at 259, 92 S. Ct. at 497, 30 L. Ed. 2d at 431. The new prosecutor, "apparently ignorant of his colleague's commitment," argued the defendant's criminal record and alleged ties to organized crime warranted the maximum sentence. *Id.* Defense counsel immediately objected and sought a continuance to prove up the plea agreement. *Id.* The sentencing judge, while expressly disavowing reliance on the new prosecutor's recommendation, nevertheless proceeded to impose the maximum sentence based on the court's own review of the record. *Id.* at 259–60, 92 S. Ct. at 497–98, 30 L. Ed. 2d at 431–32. After New York appellate courts denied relief, the United States Supreme Court granted certiorari, vacated the sentence, and remanded the case with discretion for the state court to decide whether to allow the defendant to withdraw his plea or instead grant specific performance of the plea agreement with resentencing by a different judge. *Id.* at 260, 262–63, 92 S. Ct. at 498, 499, 30 L. Ed. 2d at 432, 433.

Justice Douglas's concurring opinion stressed that a defendant's guilty plea is a waiver of the defendant's "fundamental rights to a jury trial, to confront one's accusers, to present witnesses in one's defense, to remain silent, and to be convicted by proof beyond all reasonable doubt." *Id.* at 264, 92 S. Ct. at 500, 30 L. Ed. 2d at 434 (Douglas, J., concurring) (citations omitted). Thus, the defendant is entitled to relief when the prosecutor reneges on a promise that induced the guilty plea. *Id.*

These principles are well-grounded in our court's precedent. In *Bearse,* we followed *Santobello* and further addressed the consequences

that flow from violations of plea agreements and the need for judicial enforcement:

> While proper use of plea agreements is essential to the efficient administration of justice, improper use of the agreements threatens the liberty of the criminally accused as well as the honor of the government and public confidence in the fair administration of justice. Violations of plea agreements adversely impact the integrity of the prosecutorial office and the entire judicial system. Further, because a plea agreement requires a defendant to waive fundamental rights, we are compelled to hold prosecutors and courts to the most meticulous standards of both promise and performance. For all these reasons, violations of either the terms or the spirit of the agreement require reversal of the conviction or vacation of the sentence.

*Bearse*, 748 N.W.2d at 215 (citations omitted) (internal quotation marks omitted).

Bearse was charged with sexual abuse in the third degree. *Id.* at 213. He entered into a written agreement to plead guilty, with the state required "to recommend against incarceration at the time of sentencing." *Id.* The PSI report recommended incarceration. *Id.* A different prosecutor appeared for the sentencing hearing and, when asked by the court for a recommendation, responded that " '[t]he State concurs in the recommendation of the presentence investigation report, your honor, for incarceration.' " *Id.* When the court called the state's plea agreement to the prosecutor's attention, he said, " 'Your Honor, the court is not bound by the plea agreement. The State is, so we'll . . . abide by the plea agreement. The court has the presentence investigation report.' " *Id.* The district court, without mentioning the prosecutor's recommendation, imposed an indeterminate prison sentence of up to ten years. *Id.* at 213–14. We held the prosecutor breached the plea agreement, vacated the sentence, and remanded for resentencing by a different district court judge. *Id.* at 218.

*Bearse* was preceded by *Horness,* in which the defendant was charged with three offenses relating to operating a motor vehicle while intoxicated. *Horness,* 600 N.W.2d at 296. The defendant pled guilty to two charges based on a plea agreement in which the state dismissed one charge and agreed to recommend a sentence of seven days in jail. *Id.* The PSI report recommended a longer sentence. *Id.* at 296–97. During the sentencing hearing, the prosecutor accurately recited the plea agreement and state's recommended seven-day sentence, but added the following comments:

> "*However, we had an alternative recommendation,* if you go along with the recommendation of the PSI. . . .
>
> *We would note for the Court that the recommendation of the PSI is different than [the agreed upon recommendation], based on the Defendant's long history with criminal offenses,* but we do believe we are abiding by our plea agreement.
>
> There was not any injury here. I think the facts speak for itself [sic]. *Driving drunk, you have kids in the car and they're not buckled up, that you are putting those children in danger, and fortunately there was not an accident. But the law is clear that if you drive drunk and you have kids in the car and you don't have them buckled up—apparently he was speeding in addition to drinking and driving—so he was a risk on the road and he was a risk to himself, to other drivers, and to these small, helpless children.*"

*Id.* The sentencing judge asked for clarification, and the prosecutor reiterated the plea agreement with the caveat that the court should issue an "appropriate" sentence. *Id.* at 297. The district court sentenced the defendant to concurrent, indeterminate prison terms of two years for each conviction. *Id.* We noted, "The State's promise to make a sentencing recommendation is of little value to the defendant if such a promise did not carry with it the implicit obligation to refrain from suggesting more severe sentencing alternatives." *Id.* at 299. We held the state breached the plea agreement in three ways:

> [T]he county attorney breached the plea agreement by failing to commend the recommended sentences to the court or otherwise inform the court that the State supported the suggested sentencing of the defendant. The prosecutor also breached the plea agreement by informing the court of an "alternative recommendation" and making statements implying that the alternative recommendation was more worthy of acceptance. Finally, the prosecutor breached the plea agreement by requesting "an appropriate sentence" rather than the sentence he had agreed to recommend.

*Id.* at 300 (citations omitted). We vacated the sentences and remanded the case for resentencing by a different judge. *Id.* at 301.

In *Fannon*, we recently addressed a breach of a plea agreement that did not involve the prosecutor referring to a harsher recommendation in the PSI report. 799 N.W.2d at 522. Fannon was charged with two counts of sexual abuse in the second degree against a minor child. *Id.* at 518. He reached a plea agreement with the state, under which he pled guilty to two counts of sexual abuse in the third degree, with the state to make no sentencing recommendation at the sentencing hearing. *Id.* A different prosecutor attended the sentencing hearing and urged the court to impose two consecutive ten-year prison sentences. *Id.* Defense counsel prompted an off-the-record colloquy, after which the prosecutor said, "Your Honor, if I can start again . . . ." *Id.* He referenced a plea agreement but added, "[W]e would leave the matter of consecutive versus concurrent up to the Court . . . ." *Id.* Defense counsel failed to object, seek specific performance, or consult with Fannon. *Id.* The district court imposed consecutive ten-year sentences, citing Fannon's criminal record and the PSI report. *Id.* On appeal, "the parties agree[d] the sentencing prosecutor initially violated the express terms of the plea agreement by recommending consecutive sentences." *Id.* at 520. We framed the issue as whether "the prosecution's attempt to cure its improper remarks salvaged an

otherwise broken promise." *Id.* at 520–21. We concluded that despite the attempt to "start again," the prosecutor "violated both the spirit and express terms of the agreement." *Id.* at 522. We noted the prosecutor had "revealed that, but for the agreement, the State would recommend consecutive sentences." *Id.* Thus, we held the prosecutor "failed to strictly comply with the agreement, and, accordingly, his conduct fell below the most meticulous standards of both promise and performance." *Id.* We vacated Fannon's sentence and remanded the case "for resentencing before a new judge." *Id.* at 524.

In *Bearse, Horness,* and *Fannon,* the district court was informed of the state's sentencing recommendation in its plea agreement. We nevertheless found the prosecutor in each case had undercut the plea agreement by suggesting harsher sentences. Those cases resoundingly reaffirm the prosecutor's obligation to scrupulously comply with the letter and spirit of plea agreements: " 'Our system of justice . . . does not allow prosecutors to make sentencing recommendations with a wink and a nod. The concept of justice has a far greater meaning.' " *Fannon,* 799 N.W.2d at 523 (quoting *Bearse,* 748 N.W.2d at 218). We have made clear the prosecutor must do more than simply recite the agreed recommended sentence:

> A fundamental component of plea bargaining is the prosecutor's obligation to comply with a promise to make a sentencing recommendation by doing more than "simply inform[ing] the court of the promise the State has made to the defendant with respect to sentencing." The State must actually fulfill the promise. Where the State has promised to "recommend" a particular sentence, we have looked to the common definition of the word "recommend" and required
>
>> the prosecutor to present the recommended sentence[ ] with his or her approval, to commend the sentence[ ] to the court, and to otherwise indicate to the court that the recommended

> sentence[] [is] supported by the State and worthy of the court's acceptance.

*Bearse*, 748 N.W.2d at 215–16 (quoting *Horness*, 600 N.W.2d at 299). Thus, when a prosecutor fails to commend or otherwise indicate to the court that the recommended sentence is supported by the state, let alone signals that the court should impose a harsher sentence, the plea agreement is breached.

We now apply our precedent to determine whether the prosecutor in this case complied with those obligations.

**C. The Prosecutor's Breach of the Plea Agreement.** Lopez argues the State breached the plea agreement by offering victim-impact statements from the GAL as well as from the father of the victim urging incarceration and by introducing photos of the victim's injuries that the prosecutor used in cross-examining Lopez's character witnesses. These actions, according to Lopez, undercut the State's recommendation of a deferred sentence and probation by signaling the prosecutor's view that incarceration was appropriate. The court of appeals disagreed, stating, "The State's introduction of permissible evidence—including the photographs and victim-impact statements—does not amount to a breach of the plea agreement." The court of appeals concluded the State complied with the plea agreement by "reciting the agreement to the district court and indicating its support of the recommended sentence."

We conclude that the child-victim's father and the GAL may provide victim-impact statements provided that the GAL is properly designated as the victim's representative for that purpose and provided the prosecutor did not solicit the GAL's statement to undercut the State's sentencing recommendation of probation. We further conclude that the prosecutor breached the plea agreement by gratuitously highlighting

photographs of the child-victim's injuries to suggest a harsher sentence was warranted. We address the victim-impact statements and use of the photographs separately.

1. *The victim-impact statements.* Lopez argues the governing statute permits only one victim-impact statement for the child and contends the State breached its plea agreement by introducing victim-impact statements from both B.H.'s father and the GAL. We disagree. We find no statutory prohibition against separate victim-impact statements from a minor child's parent and a properly designated GAL. The prosecutor has no right or duty to prevent victim-impact statements allowed by the Code, but the prosecutor cannot evade the State's obligation to honor its plea agreement by soliciting a GAL's victim-impact statement urging a harsher sentence. Nothing in the record indicates the prosecutor solicited the GAL's victim-impact statement or the father's.

We begin with a review of the genesis of victim-impact statements in our State. The Iowa Code first provided for victim-impact statements in 1987 in chapter 910A. *See* 1986 Iowa Acts ch. 1178, § 6 (codified at Iowa Code § 910A.5A (1987)). Chapter 910A was entitled "Victim and Witness Protection Act." Iowa Code § 910A.1. The legislature set forth the purpose of the Act as follows:

> It is the purpose of this Act to assure the fair and compassionate treatment of victims and witnesses of crimes and to increase the effectiveness of the criminal justice system by affording to them certain basic rights and consideration, and by reaffirming the criminal justice system's fundamental responsibility to victims and witnesses to ensure their equitable and fair treatment, protect them from intimidation and further injury, assist them in overcoming emotional and economic hardships resulting from criminal acts, and to keep them informed of the status of their case.

1986 Iowa Acts ch. 1178, § 1. The provisions applicable to crime victims were subsequently transferred to Iowa Code chapter 915, the Victim Rights Act. *See* 1998 Iowa Acts ch. 1090, §§ 1, 82, 84 (codified at Iowa Code § 915.1 (1999)). In *State v. Tesch*, we noted the same legislative purpose applied. 704 N.W.2d 440, 452 (Iowa 2005). "Our legislature used broad language in defining 'victim,' which has led this court in the past to give an expansive interpretation to the statute." *Id.* at 452 (citing *State v. Sailer*, 587 N.W.2d 756, 760 (Iowa 1998) (interpreting word "offense" in statutory definition of "victim" broadly to effectuate purpose of statute)).

Section 915.21 provides that "[a] victim may present a victim impact statement to the court . . . ." Iowa Code § 915.21(1) (2013). Lopez contends that this provision limits such statements to one per victim because the terms "victim" and "statement" are singular. He contends the district court committed reversible error by allowing, in effect, two victim-impact statements for B.H.—one by his father and the other by the GAL. We decline to read the statute so narrowly. *See Tesch*, 704 N.W.2d at 452 (construing Victim Rights Act broadly to effectuate its purpose). Lopez's multiplicity argument fails because B.H.'s father is defined as a separate victim entitled to present his own statement. The legislature defined "victim" for purposes of this Act as follows:

> "Victim" means a person who has suffered physical, emotional, or financial harm as the result of a public offense or a delinquent act, other than a simple misdemeanor, committed in this state. *"Victim" also includes the immediate family members of a victim* who died or was rendered incompetent as a result of the offense or *who was under eighteen years of age at the time of the offense.*

Iowa Code § 915.10(3) (emphasis added).  Under the plain meaning of this statute, B.H.'s father, Deshong, as an immediate family member of the minor victim, is himself a "victim" within the meaning of the Act.

We have addressed the statutory definition of victim in two decisions.  In *State v. Sumpter*, a murder victim's aunts and uncle gave victim-impact statements submitted to the sentencing court through the PSI.  438 N.W.2d 6, 7 (Iowa 1989).  We held that the definition of victim as " 'a person who has suffered physical, emotional, or financial harm' " meant the actual murder victim, not others who suffered as a result of her death.  *Id.* at 7–8 (quoting Iowa Code § 910A.1(1) (1987) (now found as amended at Iowa Code § 915.10(3) (2013)).  We further held that the phrase "immediate family members" was limited to "spouses and persons related within the second degree of consanguinity or affinity."  *Id.* at 8.  Accordingly, we concluded aunts and uncles had no standing to submit victim-impact statements.  *Id.*  In *Tesch,* the defendant convicted of criminal mischief challenged victim-impact testimony of the motorist-accident victim and his wife.  704 N.W.2d at 450.  The defendant had "destroyed traffic warning signs, lights and barricades protecting a recently dug ten-foot-deep . . . trench across . . . a hard-surface county road."  *Id.* at 443.  A motorist drove into the trench and was badly injured.  *Id.* at 443–44.  The defendant argued the victims of his vandalism were limited to the owners of the road signs and barricades and did not include the motorist who drove into the trench.  *Id.* at 450–51.  We disagreed and construed "victim" broadly to include those such as the motorist who suffered "harm as a direct consequence of the offense."  *Id.*  However, we held the motorist's "wife was not a 'victim' under the first sentence of the statutory definition because her harm flowed from the injuries suffered by her husband as a result of the

offense and not directly from the criminal acts." *Id.* at 452. Nor was the wife entitled to give a victim-impact statement as an immediate family member under the definition's second sentence because her husband was an adult and neither deceased nor mentally incompetent. *Id.* Accordingly, we concluded the wife's statement should not have been allowed. *Id. Tesch* and *Sumpter* make clear that the sentencing court should only receive victim-impact statements from persons allowed to give them under chapter 915.

B.H. was the only person physically injured as a direct result of Lopez's offense. Because B.H. was under the age of eighteen, his father, as an immediate family member, qualified as a victim under Iowa Code section 915.10(3). Accordingly, his father could give his own victim-impact statement to the court detailing "the physical, emotional, financial, or other effects of the offense upon the victim." *See* Iowa Code § 915.10(4).[3] In sum, B.H. and his father each qualified as victims for the purpose of the statute.

B.H., age two, was too young to give his own statement. The State concedes that Leighty as a GAL is not a "victim" herself, but argues the GAL may speak for B.H. as the victim's designated representative.[4] *See*

---

[3]Iowa Code section 915.21 provides the victim-impact statement may describe "any change in the victim's personal welfare or familial relationships as a result of the offense." Iowa Code § 915.21(2)(*c*). The statute is broad enough to allow Deshong, as a victim in his own right, to describe the impact of Lopez's offense on both Deshong and his son, B.H. The harm to each is interrelated.

[4]The State also argues that the GAL's victim-impact statement is allowed under Iowa Code sections 901.2 and 901.5. Section 901.2 provides in pertinent part:

Upon a plea of guilty, a verdict of guilty, or a special verdict upon which a judgment of conviction of a public offense may be rendered, *the court shall receive* from the state, from the judicial district department of correctional services, and from the defendant *any information which may be offered which is relevant to the question of sentencing. The court may consider information from other sources.*

*id.* § 915.21(1)(*e*) ("If the victim is unable to make an oral or written statement because of the victim's age . . . , the victim's attorney or a designated representative shall have the opportunity to make a statement on behalf of the victim."). This is a question of first impression. The term "designated representative" is not defined in the statute.

A GAL is "a person appointed by the court to represent the interests of a child in any judicial proceeding to which the child is a party." *Id.* § 232.2(22)(*a*). A GAL is automatically appointed for the child when a child in need of assistance (CINA) action is filed. *See id.* § 232.89(2). The GAL is an officer of the court. *See Estate of Leonard ex rel. Palmer v. Swift,* 656 N.W.2d 132, 140 (Iowa 2003) (describing a GAL as " 'acting as an officer of the court' " (emphasis omitted) (quoting *In re Marriage of McGonigle,* 533 N.W.2d 524, 525 (Iowa 1995)). The juvenile court appointed Leighty, an attorney, as the GAL for B.H. in the CINA action. The GAL's duties are defined by statute and include conducting interviews, making home visits, attending hearings, and conducting fact-finding to enable the GAL to represent the child's best interests. Iowa Code § 232.2(22)(*b*). The overriding concern of a GAL is to represent the best interests of the child even when the child's wishes differ. *See Estate of Leonard,* 656 N.W.2d at 142 ("[T]he guardian

---

§ 901.2 (emphasis added). Section 901.5 further provides that the court shall receive and examine "all pertinent information, including . . . victim impact statements, if any" when considering sentencing options. These general provisions must be read together with the specific provisions of chapter 915 governing victim-impact statements. *See* Iowa Code § 4.7 ("If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision."). We conclude chapter 915 controls regarding who is permitted to give victim-impact statements.

ad litem advocates for the best interests of the ward, whereas an attorney advances the wishes of the ward."). Because the roles of a GAL and an attorney for the child differ in that respect, *see id.*, we conclude Leighty was not B.H.'s "attorney" at the sentencing hearing within the meaning of section 915.21(*e*). We turn to whether Leighty was B.H.'s "designated representative" for purposes of presenting the child's victim-impact statement.

The Victim Rights Act includes a detailed provision allowing a GAL to assist a child "prosecuting witness" under the age of fourteen:

> A prosecuting witness who is a child, as defined in section 702.5 [under the age of fourteen], in a case involving a violation of . . . section . . . 726.6 [child endangerment] . . . *is entitled to have the witness's interests represented by a guardian ad litem at all stages of the proceedings arising from such violation.* The guardian ad litem shall be a practicing attorney and shall be designated by the court after due consideration is given to the desires and needs of the child and the compatibility of the child and the child's interests with the prospective guardian ad litem. *If a guardian ad litem has previously been appointed for the child in a proceeding under chapter 232 . . . the court shall appoint the same guardian ad litem under this section.* The guardian ad litem shall receive notice of and may attend all depositions, hearings, and trial proceedings to support the child and advocate for the protection of the child but shall not be allowed to separately introduce evidence or to directly examine or cross-examine witnesses. However, the guardian ad litem shall file reports to the court as required by the court.

Iowa Code § 915.37(1) (emphasis added). Under this provision, a child-victim old enough to testify in the criminal case may have the assistance of the same GAL appointed to represent the child's interests in the CINA proceeding. B.H., however, is too young to testify and, therefore, is not a "prosecuting witness." *See Black's Law Dictionary* 1839 (10th ed. 2014) (defining "prosecuting witness" as "[s]omeone who files the complaint that triggers a criminal prosecution and whose testimony the prosecution

usu[ally] relies on to secure a conviction"). Accordingly, section 915.37(1) does not specifically authorize Leighty to give the victim-impact statement on behalf of B.H.

The enactment of section 915.37(1), however, shows the legislature viewed the statutory duties of the child's GAL in a CINA proceeding as compatible with the same GAL providing assistance to the child "at all stages of the proceedings" in the criminal action, including the sentencing hearing. Indeed, if a GAL has already been appointed in the CINA case, section 915.37(1) requires that the same GAL is to assist the child in the criminal case. This makes good sense because the GAL in the CINA proceeding will be familiar with the child's circumstances and is duty-bound to look out for the child's best interests. We see no reason in the record that would disqualify Leighty, B.H.'s court-appointed GAL in the CINA proceeding, from serving as the child's "designated representative" under section 915.21(*e*) for purposes of making B.H.'s victim-impact statement. But, the record does not show the court or B.H.'s parent or guardian in fact designated Leighty to be the child's representative under section 915.21(*e*). The State's position is that Leighty's appointment as the GAL in the CINA action carried over to the criminal proceeding. We need not decide on the existing record whether Leighty was properly designated to give the child's victim-impact statement in 2014 because, as we explain below, Lopez will be resentenced in a new hearing after remand. On remand, the district court shall ensure that only a person properly designated as B.H.'s

representative under section 915.21(1)(*e*) may give a victim-impact statement on that child's behalf.[5]

There is no indication in the existing record that the prosecutor solicited the victim-impact statements given by Deshong or Leighty. *See State v. Lampien,* 223 P.3d 750, 760 (Idaho 2009) (rejecting claim that victim-impact statements breached plea agreement when "nothing in the record [suggested] that the prosecutor improperly influenced the [victims or] called the [victims] to subvert the plea agreement"). The prosecutor told the sentencing court she had no further evidence after introducing the photographs, but noted two individuals were present to give victim-impact statements. Deshong and Leighty were not witnesses called by the State. They were not placed under oath. Leighty's statement indicates she attended the plea hearing and sentencing hearing on her own initiative as the child-victim's GAL to look out for the interests of B.H. The prosecutor, regardless of any plea agreement, cannot block victims or their properly designated representatives from giving victim-impact statements allowed by chapter 915. *See id.* (noting the victims "were exercising their rights under [the victim-impact statute] . . . and therefore were not bound by the terms of the plea agreement"). Nor may prosecutors make an end run around an agreed sentencing recommendation of probation by soliciting a victim-impact statement urging incarceration. *Cf. United States v. Johnson,* 187 F.3d 1129, 1135 (9th Cir. 1999) ("By introducing [the victim's] statement solely for the purpose of influencing the district court to sentence Johnson more harshly, the prosecutor breached the government's agreement to

[5]Defense counsel made no objection to Leighty's victim-impact statement for B.H. at the February 13, 2014 sentencing hearing. No parent or guardian of B.H. objected to Leighty presenting the victim-impact statement for B.H.

recommend the low end of the sentencing range."). On remand, the district court shall proceed with resentencing consistent with this opinion.

2. *The use of the photographs.* We now turn to Lopez's claim that the prosecutor breached the plea agreement by her introduction and use of photographs of the child's injuries. The State argues the prosecutor's actions were permitted by Iowa Code sections 901.2 and 901.5, which, as noted above, permit the State to introduce evidence pertinent to sentencing. The State, however, agreed to recommend a deferred judgment and probation. We conclude the prosecutor effectively undermined the State's sentencing recommendation by using the photos in a manner suggesting a more onerous sentence was warranted.

The photos depicted the child's burn, bite mark, and bruises inflicted by Lopez. The sentencing judge would not have seen the photos if the prosecutor had not offered them into evidence. The introduction of the photos was unprovoked and unnecessary. Lopez had not argued the child had no visible injuries.[6] The prosecutor did not stop there. She used the photographs to cross-examine four witnesses called by Lopez. Each witness testified in support of Lopez's request for probation. The first, a friend, Whitmer, testified he would provide Lopez a place to stay and help him comply with the terms of probation. The prosecutor gratuitously asked Whitmer if he had seen the photos and then showed them to him, stating, "It's pretty horrible to do to a little 2-year-old, isn't it?" She followed up by questioning whether Whitmer could keep his

---

[6]"[I]t has been held that the prosecutor is free to speak for the purpose of correcting misstatements by the defense," notwithstanding a plea agreement that otherwise precludes introduction of evidence at sentencing detrimental to the defendant. 5 Wayne R. LaFave et al., *Criminal Procedure* § 21.2(d), at 1018–19 (5d ed. 2009).

own child safe from Lopez. She used the photos with three more witnesses, asking, for example, whether the injuries shown were "better or worse" than expected. After referring to Lopez's "anger issues," the prosecutor asked Lopez's father if the photos "cause you concern that your son could do that to a two-year-old." None of the four witnesses, or Lopez himself, had attempted to minimize the child's injuries. The cross-examination was unnecessary to correct the record. The implicit message sent by the prosecutor's cross-examination was that Lopez still had anger issues and might hurt another child if released on probation. The prosecutor's conduct was flatly inconsistent with the State's plea agreement to recommend probation.

In *State v. Urista,* the Kansas Supreme Court recently held a prosecutor breached a plea agreement she had correctly recited by making negative comments about the defendant that "effectively undermined the sentencing recommendation." 293 P.3d 738, 750 (Kan. 2013). Specifically, after reciting the terms of the plea agreement and recommendation for concurrent sentences, the prosecutor volunteered a series of comments about the defendant, describing him as a "very dangerous young man . . . [with] absolutely no remorse." *Id.* at 742. The *Urista* court concluded, "Because the prosecutor's comments were unprovoked and unnecessary, one would have to assume that her intention for making the comments was to convince the district court to impose a sentence greater than the recommended sentence." *Id.* at 750–51. We reach the same conclusion here.

Indeed, the sentencing court's comments reflect the prosecutor's theme developed on her cross-examinations that Lopez's release on probation would put other children at risk. The court stated:

> I have some real concerns about your ability to be able to control your temper and not do this again . . . . You committed a very serious assault offense against a 2-year-old and you . . . cannot be trusted in the community on street probation or even a residential facility. You are going to prison, and I think that is the only appropriate sentence here.

The prosecutor's recitation of the agreed sentencing recommendation did not cure her breach of the plea agreement. *See Fannon*, 799 N.W.2d at 521–22 (prosecutor failed to cure breach of plea agreement by starting over and correctly stating agreed recommendation). Our precedent makes clear the prosecutor must do more than merely recite the plea recommendation; the prosecutor must " 'indicate to the court that the recommended sentence[] [is] supported by the State and worthy of the court's acceptance.' " *Bearse*, 748 N.W.2d at 216 (quoting *Horness*, 600 N.W.2d at 299).[7] This prosecutor failed to

---

[7]The State contends our precedent should be reexamined in light of *United States v. Benchimol*, 471 U.S. 453, 105 S. Ct. 2103, 85 L. Ed. 2d 462 (1985). We disagree. That per curiam decision concluded federal prosecutors are not obligated to "enthusiastically" endorse an agreed sentencing recommendation, unless they specifically committed to doing so in the plea agreement. *Id.* at 456, 105 S. Ct. at 2105, 85 L. Ed. 2d 466. That decision is based on Federal Rule of Criminal Procedure 11, which "provides an elaborate formula for the negotiation of plea bargains." *Id.* at 455, 105 S. Ct. at 2104, 85 L. Ed. 2d at 466. The *Benchimol* Court declined to impose an implied obligation to enthusiastically advocate for the recommended sentence under the federal plea bargain rule. *Id.* at 455, 105 S. Ct. at 2105, 85 L. Ed. 2d at 466 ("But our view of Rule 11([c]) is that it speaks in terms of what the parties in fact agree to, and does not suggest that such implied-in-law terms as were read into this agreement by the Court of Appeals have any place under the Rule."). By contrast, long after *Benchimol* was decided in 1985, we reiterated the prosecutor's obligation under Iowa law is to not only recite the recommended sentence but also indicate that it is " 'worthy of the court's acceptance.' " *Bearse*, 748 N.W.2d at 216 (quoting *Horness*, 600 N.W.2d at 299–300 (recognizing prosecutor's "implicit obligation to refrain from suggesting more severe sentencing alternatives")). The Iowa Rule of Criminal Procedure governing plea-bargaining differs materially from the Federal Rule applied in *Benchimol*. *Compare* Fed. R. Crim. P. 11(c), *with* Iowa R. Crim. P. 2.10(1). In any event, the problem in this case is not merely the prosecutor's failure to enthusiastically endorse the recommended sentence but rather her conduct affirmatively undermining the recommendation. *See United States v. Cachucha*, 484 F.3d 1266, 1270–71 (10th Cir. 2007) ("While a prosecutor normally need not present promised recommendations to the court with any

indicate probation was worthy of the court's acceptance. To the contrary, her use of the photos on cross-examination sent the opposite message. She violated "the spirit of the agreement" and fell short of "the most meticulous standards of both promise and performance" to which we hold prosecutors. *Bearse,* 748 N.W.2d at 215 (internal quotation marks omitted).

If the prosecutor believes incarceration is appropriate, the State should not enter into a plea agreement to recommend probation. Iowans are entitled to expect the state will honor its plea agreements and sentencing recommendations that induce guilty pleas. Courts, to protect the integrity of our criminal justice system, must intervene when the government breaks its promises. *See id.* at 218. Lopez gave up his right to a jury trial and related constitutional rights in exchange for the State's plea agreement and sentencing recommendation. Fairness and due process require the State to honor its promises.

For these reasons, we hold the prosecutor's use of the photographs breached the plea agreement.[8] We presume prejudice. Lopez's trial

_____

particular degree of enthusiasm, it is improper for the prosecutor to inject material reservations about the agreement to which the government has committed itself.").

[8]Other state supreme courts have concluded a prosecutor breaches a plea agreement by making comments that indicate the court should impose harsher punishment than the sentence the state agreed to recommend. *See, e.g., Urista,* 293 P.3d at 750–51 ("[T]he prosecutor's comments about Urista effectively undermined the sentencing recommendation. . . . Though [the prosecutor] made the sentencing recommendation, her additional comments at sentencing indicate that she merely paid lip service to the recommendation."); *State v. Rardon,* 61 P.3d 132, 136 (Mont. 2002) ("While we agree it is completely appropriate for the prosecutor to question victims and solicit their testimony at a sentencing hearing and for those victims to express their fears and feelings, it is not acceptable for a prosecutor to aggressively solicit testimony that is clearly intended to undermine the plea agreement and to convince the sentencing court that a plea bargained sentence should *not* be accepted."); *State v. Landera,* 826 N.W.2d 570, 576 (Neb. 2013) (holding a party breaches a plea agreement by "acting in a manner not specifically prohibited by the agreement but still incompatible with explicit promises made in the agreement"); *Vanden Hoek v. Weber,* 724 N.W.2d 858, 862–63 (S.D. 2006) ("The defendant waives significant rights by

counsel was ineffective for failing to object to that breach at the sentencing hearing. Lopez is entitled to specific performance of the State's plea agreement. *Fannon*, 799 N.W.2d at 524.

**D. Remedy.** Lopez's appellate brief asked that he be permitted to withdraw his guilty plea or, alternatively, that the case be remanded for resentencing by a different judge. His application for further review narrowed his requested relief to resentencing by a different judge. That was the relief sought by his appellate counsel at oral argument.[9]

We have repeatedly held that the remedy for the State's breach of a plea agreement as to a sentencing recommendation is to remand the case for resentencing by a different judge, with the prosecutor obligated to honor the plea agreement and sentencing recommendation. *Fannon*, 799 N.W.2d at 524 ("Doing so ensures Fannon receives the benefit of the bargain by demanding specific performance of the plea agreement."); *Bearse*, 748 N.W.2d at 219–20; *Horness*, 600 N.W.2d at 301. As federal appellate courts have stated under similar circumstances, " 'We intend

---

entering into a plea agreement and that waiver is 'not in exchange for the actual sentence or impact on the judge, but for the prosecutor's *statements* in court.' " (quoting *State v. Waldner*, 692 N.W.2d 187, 191 (S.D. 2005)); *State v. Talley*, 949 P.2d 358, 364 (Wash. 1998) ("While, as we have observed, merely presenting relevant evidence to the sentencing court and responding to its inquiries is an appropriate fulfillment of the prosecutor's duty as an officer of the court, a deputy prosecutor could easily undercut the plea agreement by placing emphasis on the evidence that supports findings that aggravating factors are present."); *State v. Williams*, 637 N.W.2d 733, 745 (Wis. 2002) ("The State may not accomplish by indirect means what it promised not to do directly, and it may not covertly convey to the trial court that a more severe sentence is warranted than that recommended.").

[9]Lopez also asks that we order his resentencing to proceed with a different prosecutor without citing any authority for such relief. We have never granted that relief for breach of a plea agreement. Lopez has not established grounds to disqualify the prosecutor. To order such relief here would encroach on the powers of the executive branch. Lopez is not entitled to such relief. Of course, on remand the prosecutor is required to honor the plea agreement and sentencing recommendation consistent with this opinion.

no criticism of the district judge by this action, and none should be inferred.'" *United States v. Cachucha*, 484 F.3d 1266, 1271 (10th Cir. 2007) (quoting *United States v. Mondragon*, 228 F.3d 978, 981 (9th Cir. 2000)).

## IV. Disposition.

For the foregoing reasons, we affirm Lopez's conviction, but vacate the decision of the court of appeals, vacate Lopez's sentence, and remand the case for resentencing before a different judge consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT SENTENCE VACATED; CASE REMANDED FOR RESENTENCING.**