# IN THE COURT OF APPEALS OF IOWA

No. 16-0935
Filed September 12, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DUSTIN JEROME JEFFERSON,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Tama County, Mary E. Chicchelly,

Judge.


        A defendant appeals his conviction for aiding and abetting first-degree

murder. **AFFIRMED.**



        Cory J. Goldensoph, Cedar Rapids, for appellant.

        Thomas J. Miller, Attorney General, and Darrel L. Mullins and Laura Roan,

Assistant Attorneys General, for appellee.



        Heard by Danilson, C.J., and Potterfield and Mullins, JJ.

**MULLINS, Judge.**

Dustin Jefferson appeals his conviction of aiding and abetting first-degree murder in violation of Iowa Code section 707.2 (2013). He argues there is insufficient evidence to support his conviction and his trial counsel was ineffective in a number of respects.

I.     **Background Facts and Proceedings**

Dustin[1] was convicted of aiding and abetting his mother, Ginger Jefferson, in the stabbing death of his wife, Kerry Jefferson. Dustin and Kerry had a volatile marriage and lived separately. Dustin lived at his cousin Carlos's house, but Kerry often spent time with him there. Kerry fearfully told a friend shortly before her death that Dustin might hurt or kill her. The next day, however, she did not want to talk about it.

Kerry and Dustin spent the night together at Carlos's house on September 24, 2013. The next day, September 25, Ginger and her daughter Sahara, Dustin's sister, arrived at the house before 10:00 a.m. Ginger, Sahara, and Dustin began to drink alcohol together. Around 11:00 a.m., Kerry left the house. A liquor store clerk testified that between 11:00 and 11:30 a.m., Kerry arrived at the store and purchased a bottle of whiskey. The store clerk testified she knew Kerry and had a chance to observe her face during the sale; she did not notice any bruises or injury to her body or face, and testified "she looked—she actually looked really good that day."

---

[1] Several of the participants in these events share the last name, Jefferson. We refer to those participants by their first names.

Kerry's mother testified that between 11:00 and 11:30 a.m., Kerry came to visit her for approximately an hour. Kerry was in a good mood and was excited that she was going to have a job interview for a new CNA job the next day. Her mother testified concerning how Kerry looked that day:

> Q. When you saw your daughter Kerry on the 25th of September of 2013, did she have any bruises or injuries or any indication that she'd been in any sort of physical altercation? A. No.
> Q. She looked fine? A. She looked fine.

Kerry then returned to Carlos's house.

According to Dustin's police interview given later that day, Dustin, Sahara, and Ginger were going to go for a drive and asked Kerry if she wanted to come. Dustin told police:

> And I'm driving. And I'm drunk, so she's all, she's already drunk and she's already mad because I'm driving and she knows I got a warrant, so that's her main thing. Well, I'm calling the cops so you don't drive. You got a warrant. . . . I was like well, we're gonna go for a drive, you wanna go? She said no, I'm not gonna go. And I was like all right, well, we're gonna go for a cruise, and she said well, I'm calling the fuckin' cops because you're driving.

Sometime before 1:00 p.m., Dustin, Ginger, and Sahara left in Sahara's car, with Dustin driving.

Between 1:00 and 2:40 p.m., Kerry's phone was used to place several phone calls to Dustin and several phone calls to the Meskwaki Nation Police Department.[2] Kerry called the police department at 1:22 p.m. and had a conversation with Officer Joe Hols about an outstanding arrest warrant for Dustin, and possible locations where Dustin could be found. There were then three calls

---

[2] A search warrant executed on the phone revealed the time and duration of the calls.

to Dustin's phone—1:56 p.m. for one minute and seven seconds; 2:02 p.m. for twenty-two seconds; and 2:11 p.m. for eighteen seconds.

At 2:15 p.m., Kerry called the police department a second time and requested the administrative assistant to connect her to Officer Hols. Officer Hols was unavailable and Kerry was transferred to Detective Craig Karr. This second call to the police department lasted seven minutes and six seconds. At 2:22 p.m., Kerry called Dustin in a call lasting sixteen seconds. Also at 2:22 p.m., Kerry called the police department for one minute and twenty-three seconds. She requested to speak to Detective Karr, was put on hold, and then disconnected. At 2:24 p.m., Kerry phoned Dustin in a call lasting fifty-five seconds.

At 2:33 p.m., Kerry called the police department, apparently inadvertently, for fifty-six seconds, then four and seven seconds. In the first, longest call, the administrative assistant at the police department recognized the voice of Kerry arguing with two other people she said sounded like females. The assistant heard Kerry yelling that the other two were going to jail for what they had done and heard what she identified as two female voices also yelling in response, but she was unable to understand what they were saying. Eventually, Kerry realized that someone on her phone was trying to get her attention, and she identified herself and apologized for the "ass dial."

At 2:35 p.m., approximately one minute after her inadvertent calls to the police department, Kerry called the police department again and spoke to Detective Karr in a call lasting two minutes and twenty seconds. Detective Karr testified Kerry asked him if he had arrested Dustin yet. When Detective Karr

replied he had not, she told him to get to 104 Harmon Street—Carlos's house—because Dustin was there and "won't be here long."[3]

According to Dustin's statement to law enforcement, he and Ginger returned to Carlos's house. Sahara was no longer with them; she testified that during the drive Dustin stopped the car and she got out to go to the bathroom outdoors and did not get back in the vehicle. A police officer later saw Sahara walking on the highway at 2:37 p.m. and transported her to the Grinnell Medical Center for treatment for diabetes.

According to Dustin's statement to police the following day, he and Ginger got out of the car at Carlos's house, Dustin went to the bathroom outside, and then he sat down in a chair in front of the garage with another beer. Ginger went inside to use the bathroom. Dustin said Kerry stuck her head out the door and told him the police were coming. Minutes later, Ginger emerged from the back of the house with her hands bloody, told Dustin she had "hurt Kerry," and took off running. Dustin stated he was "in shock" and got in his car and drove around the block looking for Ginger.

Ginger went to Amber Navarro's home, approximately one block from Carlos's house. Amber is the girlfriend of Daniel, who is Ginger's nephew and Dustin's cousin. Ginger was upset, intoxicated, and had blood on her hands. Because Amber's children were present, Amber assisted Ginger in washing her hands so the children would not see the blood and be frightened. At some point,

---

[3] We recognize the inconsistency between Kerry's question to Detective Karr and her subsequent statement that Dustin was present at Carlos's house.

Ginger fell and Amber helped her up. During her direct examination by the State, Amber testified:

> Q. What else did Ginger Jefferson say regarding stabbing her daughter-in-law Kerry? A. She said that her and Kerry got into it and she accused her sleeping—her and Dustin sleeping together on a gravel road.
> Q. That Kerry was? A. Kerry was accusing Dustin and Ginger of sleeping together on a gravel road.
> Q. And did Ginger explain how she stabbed or came to stab her daughter-in-law Kerry? A. No, she just said they got into it and she stabbed her twice in the neck.
> Q. What did she say about a knife being brought out? A. She said that they were playing around with a knife.
> . . . .
> Q. Did she explain at all how she happened to take the knife? A. No.
> . . . .
> Q. Did she explain who they was? A. No.

Amber testified Ginger believed Kerry was dead. Ginger asked Amber to call Laurie Davenport, a daughter-in-law to Ginger, and both Amber and Laurie recall Ginger stating, "I stabbed her twice in the neck." Amber then called the police.

The police arrived at Carlos's house at 2:44 p.m. to arrest Dustin on his outstanding warrant. Dustin pulled into the driveway next to the police car. When the officers approached him, Dustin told them he needed to check on his wife because she might be hurt or dead. Police entered the home and found Kerry dead in a pool of blood on the floor. She had sustained two stab wounds to the neck.

Forensic tests show Kerry's blood on the outside door frame of Amber's house and on Amber's shirt. Kerry's blood was also found on Dustin's clothing and shoes. Police found a folding knife in the back yard of Carlos's house; Dustin said it belonged to him and he left it near the sink in the kitchen.

In June 2014, Dustin was charged by trial information with first-degree murder as either a principal or an aider and abettor. Ginger was also charged, tried separately, and convicted of first-degree murder. Dustin's first jury trial resulted in a hung jury. A second jury convicted Dustin of aiding and abetting murder in the first degree.

Dustin appeals his conviction. Additional facts will be set forth below as are relevant to the issues raised on appeal.

## II.     Sufficiency of the Evidence

Dustin argues the State did not present sufficient evidence at trial to convict him of aiding and abetting murder in the first degree. Challenges to the sufficiency of the evidence are reviewed for corrections of errors at law. *State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018). The court views "the evidence 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (quoting *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017)). All evidence is considered, not just that of an inculpatory nature. *See Huser*, 894 N.W.2d at 490. "[W]e will uphold a verdict if substantial evidence supports it." *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018) (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)). "Evidence is substantial if, 'when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.'" *Id.* (quoting *Ramirez*, 895 N.W.2d at 890).

To uphold Dustin's conviction for aiding and abetting first-degree murder, the State must prove Dustin knew Ginger had specific intent to kill.[4] First-degree murder requires the accused to "willfully, deliberately, and with premeditation kill[] another person." Iowa Code § 707.2(1). "When . . . intent is an element of the crime charged, a person may be convicted on a theory of aiding and abetting if she participates with either the requisite intent, or with knowledge the principal possesses the required intent." *State v. Tangie*, 616 N.W.2d 564, 574 (Iowa 2000).

The State's theory at trial was that Dustin was present in the home when Ginger stabbed Kerry. The State presented forensic evidence Kerry's blood was found on Dustin's clothing and sandals. The expert at trial testified the blood found on the back of Dustin's shirt was consistent with a transfer stain, where a bloody object came into contact with the shirt. Dustin's sandals had spatter stains on the top and there was a drop of blood on the bottom of one sandal. The expert at trial testified spatter stains could be caused by several things, including:

> One would be impact where you beat somebody with a baseball bat or shoot them with a gun, that would be a force acting upon a blood drop or a blood pool to break it up into these small sizes of stains.

---

[4] The following marshalling instruction was provided to the jury:

The State must prove all of the following elements of Murder in the First Degree:

1. On or about . . . September 25, 2013, Ginger Jefferson, aided and abetted by the defendant, without justification, stabbed Kerry O'Clair Jefferson.

2. Kerry O'Clair Jefferson died as a result of being stabbed.

3. Ginger Jefferson, aided and abetted by the defendant, acted with malice aforethought, with the knowledge of the defendant or the defendant acted with malice aforethought.

4. The defendant aided and abetted Ginger Jefferson who, with the knowledge of the defendant, acted willfully, deliberately, premeditatedly and with a specific intent to kill Kerry O'Clair Jefferson.

If the State has proved all of the elements, the defendant is guilty of Aiding & Abetting Murder in the First Degree. If the State has failed to prove any one of the elements, the defendant is not guilty.

Another would be expiration of blood where you have blood in your mouth, your nose, your airway and you're coughing it out, kind of wheezing it out, and it comes out your mouth and nose. Satellite spatter is another. So if these shoes were flat on the floor and somebody was wearing them and blood was dripping onto the floor right next to them, certainly small satellite stains could come up from the parent stain that hits the floor and be deposited as spatters on these shoes.

Dustin maintains he never entered the home and argues Kerry's blood on his clothing and shoes must have been transferred from Ginger. Dustin argues the spatter stains on his shoes and the blood stain on the bottom of his shoe were from Ginger dripping blood on him. The expert testified it was possible the spatter stain was from blood dripping off of Ginger. Dustin had less blood on his clothing and shoes than Ginger, and argues that fact disproves the State's theory he was in the room at the same time Ginger was murdering Kerry.

The State argues the drop of blood on the bottom of Dustin's shoe indicates Dustin stepped in blood. For Dustin to have stepped in blood outside the house, there would have to be blood drops outside the house where Ginger stood when she came out of the house and told Dustin she had hurt Kerry. However, crime scene experts testified they looked for blood outside on the driveway and sidewalk and did not find any.

The State presented evidence Kerry was bruised and had a black eye and argues that because Ginger was twenty-five years older and eighty pounds lighter than Kerry, Ginger would have had a hard time physically overpowering Kerry, and Dustin must have held Kerry down as she was stabbed.[5] The medical examiner

---

[5] The jury also heard testimony from Kerry's mother from which it could have found that Ginger and Kerry had a previous physical altercation during which Kerry was holding Ginger down and Dustin had to pull her off of Ginger.

testified he could not tell when the bruising occurred. There is forensic evidence Kerry stood up and fell after she was stabbed. Amber Navarro testified a distraught and intoxicated Ginger made statements shortly after the murder taking responsibility for the stabbing, and said "they were playing around with a knife." Ginger did not tell Amber how she happened to take the knife.

The State also argues the murder weapon was Dustin's personal pocket knife, as Dustin readily admitted, and that Dustin probably provided the knife to Ginger. Dustin told police officers he regularly left his knife in the kitchen when he bathed, including a few nights before the murder. The knife was found in the backyard of the home the day after the murder. In his police interview, Dustin stated Ginger used the back door when she came out of the house. The State argues Dustin must have gone into the backyard before he returned to his car, because Ginger's hands were bloody and the back door handle did not have any blood on it, implying that Dustin had to have opened or closed the door for her. The record is inconclusive on whether the front door was tested for blood.

"[I]ntent is a state of mind difficult of proof by direct evidence. It may, however, be established by circumstantial evidence and by inferences reasonably to be drawn from the conduct of the defendant and from all the attendant circumstances in the light of human behavior and experience." *Kelso-Christy*, 911 N.W.2d at 667–68 (quoting *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992)). We look at the evidence cumulatively. *See Huser*, 894 N.W.2d at 493 ("None of the facts presented above, standing alone, would be sufficient to support a verdict, but their cumulative effect provides a reasonable basis for the jury's guilty verdict."); *see also Tangie*, 616 N.W.2d at 574 (finding knowledge of and proximity

to the crime scene, together "with circumstantial evidence such as 'presence, companionship, and conduct before and after the offense is committed,' may be enough to infer a defendant's participation in the crime" (quoting *State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994))).

Here, the evidence shows a long history of conflict between Ginger and Kerry, a long history of marital strife between Dustin and Kerry, with interims of getting along, and an argument immediately leading up to the murder. Dustin and Kerry spent the night before the murder together, they drank alcohol together with Ginger and Sahara the next day, and then Kerry got mad at Dustin and was trying to get him arrested. There is an inference that Dustin and Ginger were enraged that Kerry called the police about Dustin's warrant and his whereabouts and so formed the specific intent to kill. The State theorizes that Ginger, with bloody hands, left on foot to go to Amber's house while Dustin threw away the knife, wiped his hands and the doorknob, closed the back door, and got into his car and drove around before returning and pulling into the driveway next to the police car and directing the police to check on his wife because she might be hurt or dead.

On the morning of Kerry's death, both her mother and a liquor store clerk saw Kerry and neither noticed a black eye or bruising. Kerry's autopsy revealed a black eye and numerous bruises, signs indicating she had been beaten. The crime scene showed evidence of a struggle, multiple stab wounds to Kerry's person, and at least one missed effort to stab her. Those facts, together with the size and weight differential between Kerry and Ginger—Kerry was taller and heavier than Ginger—create an inference that Ginger could not have beaten and overcome Kerry and held her down to stab her without assistance; or would have been unable

to render Kerry unconscious by herself in order to then stab Kerry to death by herself. The inferences drawn from the crime scene and Kerry's condition support the State's argument that someone assisted Ginger in killing Kerry. The evidence shows Dustin was the only person with Ginger when she arrived at Carlos's house and was also the only person present when she left the house.

When the State chose to charge Dustin with aiding and abetting first-degree murder, it assumed the burden to prove Dustin either shared the requisite specific intent or knew of Ginger's mental state before or at the time the offense was committed. *See State v. Pearson*, 547 N.W.2d 236, 241 (Iowa Ct. App. 1996). The undisputed evidence places Ginger in the house, and Dustin admitted to being outside the house at the time of the murder. There is no evidence to suggest that anyone other than Dustin and Ginger were at 104 Harmon Street between 2:35 and 2:44 p.m. that day. The administrative assistant at the police department had answered Kerry's accidental call at 2:33. She testified:

> I recognized Kerry's voice just because I knew who she was. I recognized her voice and I can hear her hollering you're going to jail, you're going to jail, you're both going to jail for what you did. The people—I couldn't recognize their voices because it seemed like they were a little bit farther away from the phone; they were hollering back at her, but I couldn't make out their words. I couldn't—I can make out Kerry's words because she was closer to the phone, but I couldn't make out the people that were hollering at her.
>     Q. If I'm understanding correctly, though, you are hearing voices of three people? A. I heard Kerry's voice, and then two other people yelling at her.
>     Q. But you were able to distinguish that it was three voices; is what you were hearing? A. Yes.

She later testified she thought all three voices sounded like females. There is no question that one of the voices was Ginger. The other voice could not have been Sahara because she was found intoxicated on a rural highway at 2:37 p.m. From

2:35 to 2:37 p.m., Kerry was on the phone telling Detective Karr that Dustin was there at 105 Harmon Street. In one of Dustin's statements to law enforcement, he said that while Ginger was in the house going to the bathroom and he was outside by the garage, Kerry stuck her head out the door and told him the police were coming.

Amber Navarro testified:

> Q. What else did Ginger Jefferson say regarding stabbing her daughter-in-law Kerry? A. She said that her and Kerry got into it and she accused her sleeping—her and Dustin sleeping together on a gravel road.
> Q. That Kerry was? A. Kerry was accusing Dustin and Ginger of sleeping together on a gravel road.

Among the stock jury instructions given by the district court, it instructed the jury "to reconcile any conflicts in the evidence; but if you cannot, accept evidence you find more believable," and that they "may believe all, part, or none of any witness's testimony." The State argues it was possible that Dustin and Ginger were the two other voices arguing with Kerry at 2:33 p.m., shortly before the murder, when Kerry made an accidental phone call to the Meskwaki Nation Police Department. The administrative assistant testified she heard Kerry arguing with people—whom she identified as female based on their voices—stating "you're both going to jail for what you did." Amber testified that Ginger described an argument between her and Kerry involving accusations by Kerry that Ginger and Dustin had slept together. The jury was faced with trying to reconcile the evidence concerning a number of questions, including: (1) Who was present at 105 Harmon Street in the last few minutes of Kerry's life; (2) who was the third person heard by the administrative assistant during the inadvertent phone call from Kerry; (3) did Dustin

remain outside while Ginger was inside as he claimed to law enforcement; (4) who was Ginger talking about when she told Amber "they" were playing around with a knife; (5) could Ginger have overcome Kerry and killed her with Dustin's knife without assistance; and (6) how did Dustin get blood on him? As the jury was instructed, it was free to reject the administrative assistant's testimony or to decide Dustin's voice could be mistaken for a female voice.[6] *See State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) ("The jury is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive."). The other voice could not have been Sahara. She was seen walking on a public street at the time of the accidental call. Officer Bruce Rhoades testified he responded to a 2:17 p.m. call regarding a female walking on a road and picked up Sahara at 2:37 p.m.

The State provided evidence from which the jury could find Dustin and Ginger were arguing with Kerry minutes before her murder and Dustin was present during Kerry's murder. The evidence also supports a finding that someone assisted Ginger to subdue Kerry before she was stabbed or held her down while she was stabbed, and that Ginger used Dustin's knife to stab Kerry. We do not know and cannot know whether the jury relied on this theory of the facts or some other theory when it found Dustin guilty. Our duty is only to determine if there is evidence from which a reasonable jury could have found Dustin guilty beyond a reasonable doubt. Taking the evidence in the light most favorable to the State, including reasonable inferences, we find the State presented sufficient evidence

---

[6] The jury was also free to accept or reject different portions of Kerry's statements in her telephone conversation with Detective Karr.

from which a jury could conclude Dustin knew of Ginger's intent to kill Kerry and assisted her in the act of killing Kerry.

The State provided sufficient evidence to support the conviction for aiding and abetting first-degree murder under section 707.2.

## III.    Ineffective Assistance of Counsel

Dustin contends his trial counsel was ineffective in failing to object to several instances of alleged prosecutorial misconduct and alleged violations of the court's limine order.  We review ineffective-assistance-of-counsel claims de novo.  *State v. Harrison*, 914 N.W.2d 178, 188 (Iowa 2018).  Dustin "must establish by a preponderance of the evidence that '(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice.'"  *State v. Lopez*, 907 N.W.2d 112, 116 (Iowa 2018) (quoting *State v. Harris*, 891 N.W.2d 182, 185 (Iowa 2017)); *accord Strickland v. Washington*, 466 U.S. 668, 687 (1984).  We "may consider either the prejudice prong or breach of duty first, and failure to find either one will preclude relief."  *State v. McNeal*, 897 N.W.2d 697, 703 (Iowa 2017) (quoting *State v. Lopez*, 872 N.W.2d 159, 169 (Iowa 2015)).  A failure to register meritless motions or arguments does not amount to ineffective assistance of counsel.  *See State v. Tompkins*, 859 N.W.2d 631, 637 (Iowa 2015).  "Improvident trial strategy, miscalculated tactics or mistakes in judgment do not necessarily amount to ineffective counsel."  *Lamasters v. State*, 821 N.W.2d 856, 866 (Iowa 2012) (quoting *Hinkle v. State*, 290 N.W.2d 28, 34 (Iowa 1980)).

A.     Failure to Object to Alleged Prosecutorial Misconduct

1.     *Blood on Ginger and Dustin*

Dustin contends his attorney was ineffective in failing to object to the prosecutor's claim in closing arguments that Dustin had as much blood on him as Ginger did. Dustin specifically complains his counsel failed to object to the following statement:

> And you think if [Ginger] stabbed her, she'd be covered in blood, but other than her hands which held the knife that did have Kerry's blood, she didn't have any more blood on her clothes or shoes than [Dustin] did.

On our review of the evidence and the closing arguments, we determine the State's closing argument remarks comparing the quantity of blood evidence may arguably have been overstated, but was prefaced by telling the jury: "So look at the physical evidence. You look at all the blood on the floor and take a look at all those photos." The jury had the opportunity to test the State's argument against the evidence. The blood evidence was also thoroughly addressed by defense counsel in his closing argument. We do not find counsel's failure to object to the argument constituted a failure to provide competent representation. Counsel was not ineffective.

2.     *Disparaging Dustin*

Dustin claims his counsel was ineffective in failing to object to the prosecutor's statements in closing argument implying that he lied to law enforcement at the time they notified him of Kerry's death. Dustin argues it was improper for the prosecutor to call him a liar and cites *State v. Graves* to support his position. *See* 668 N.W.2d 860, 876 (Iowa 2003) ("[I]t is improper for a prosecutor to call the defendant a liar, to state the defendant is lying, or to make similar disparaging comments."). However, *Graves* contemplated a situation in

which the prosecutor forced a testifying defendant to comment on the veracity of another witness and then, in closing rebuttal argument, expressly claimed the defendant was lying in his sworn testimony at trial. *See id.* at 867–68. Our supreme court found it "improper to ask the defendant whether another witness has lied," and to call a testifying defendant a liar. *See id.* at 873, 876. The court explained, however, that "a prosecutor is still free 'to craft an argument that includes reasonable inferences based on the evidence and . . . when a case turns on which of two conflicting stories is true, [to argue that] certain testimony is not believable.'" *Id.* at 876 (alterations in original) (citation omitted).

Dustin did not testify at trial, so the concerns contemplated in *Graves* are not at play. The central teaching of *Graves* is that the "defendant is entitled to have the case decided solely on the evidence." *See id.* at 874 (quoting *State v. Williams*, 334 N.W.2d 742, 744 (Iowa 1983)); *see also State v. Carey*, 709 N.W.2d 547, 556 (Iowa 2006). *Graves* misconduct occurs when the prosecutor attempts to incite the passions of the jury by going outside the record of evidence. *See Carey*, 709 N.W.2d at 556. Such was not the case here.

Dustin only complains of the following two excerpts of the prosecutor's closing arguments:

> Now, later he [played] possum pretty darn good with the [Division of Criminal Investigation (DCI)] agents. He didn't feign a bit of surprise. He feigned complete and utter devastation and shock.
> . . . .
> . . . . [T]hey give him the death notice, they say she didn't make it. . . . and he starts to cry and scream and wail. In fact, note in his grief whether you find it credible or not, because . . . he looks up, and he looks squarely in the camera, and it's almost as if you see him make the decision to start telling a story about his mother's involvement, to come clean, just as [defense counsel] explained. But that's an act, folks. That's all an act.

But Dustin chooses selective language supportive of his argument and fails to acknowledge the prosecutor's detailed walk through the evidence following both statements. After each statement, the prosecutor explained why the evidence supported a conclusion that Dustin already knew Kerry was dead when he spoke with DCI agents by pointing to several pieces of specific evidence to that effect. The challenged statements were nothing more than arguments based on reasonable inferences of the evidence, and they did not amount to misconduct. *See Graves*, 668 N.W.2d at 876. Defense counsel was under no duty to object and was therefore not ineffective in failing to do so.

### 3.      *Distorted burden of proof*

Next, Dustin claims his counsel was ineffective in failing to object to the prosecutor's alleged distortion of the burden of proof in her closing argument. Dustin specifically complains of his counsel's failure to object to the following statement by the prosecutor: "In opening statements, [defense counsel] told you that there would be evidence that the defendant went into the house after the stabbing and then left. There has been no evidence presented to that effect."

The prosecutor's statement was a comment on the lack of evidence in support of defense counsel's opening statement which apparently was intended to explain how Dustin got blood on his shoe. The prosecutor merely directed the jury's attention to Dustin's failure to present specific evidence he promised in opening statements. We find this permissible and conclude counsel was under no duty to object. *See, e.g.*, *State v. Hanes*, 790 N.W.2d 545, 557 (Iowa 2010) (distinguishing between (1) an "attempt to shift the burden to the defense to call

the witnesses or to suggest the jury could infer from the defense's failure to call the witnesses that they would not have said anything helpful to the defense," which is improper, and (2) a situation "where the prosecutor generally referenced an absence of evidence supporting the defense's theory of the case," which is permissible); *State v. Davisson*, No. 15-1893, 2016 WL 7393890, at *2 (Iowa Ct. App. Dec. 21, 2016) ("[P]rosectuion comments that are aimed at exposing a lack of evidence to support a defendant's general theory or a particular proposition are not improper."); *see also Wise v. State*, 751 A.2d 24, 34 (Md. Ct. Spec. App. 2000) ("[A] defense attorney's promising in opening statement that the defendant will produce evidence and thereafter failing to do so does open the door to the fair comment upon that failure . . . .").

Furthermore, the jury was appropriately instructed that the burden was on the State to prove Dustin guilty beyond a reasonable doubt. "We presume juries follow the court's instructions." *Hanes*, 790 N.W.2d at 552. The court's instructions on the burden of proof dissipated any prejudice flowing from the challenged statement.

### 4. *Inflammatory words*

Finally, Dustin asserts his attorney was ineffective in failing to object to the prosecutor's repeated usage of allegedly inflammatory words during closing arguments. Dustin specifically complains of his counsel's failure to object to the prosecutor's repeated use of the words "beatings," "violent," and "violence" when describing the nature of Dustin and Kerry's volatile relationship. He asserts the prosecutor's use of these words was improper because they misstate, distort, and overemphasize the record. We easily reject Dustin's argument as to the

prosecutor's use of the words violent and violence, because specific testimony was presented that Dustin and Kerry's marriage was violent. As to the prosecutor's use of the word "beatings," we acknowledge no specific testimony was had that Kerry suffered "beatings" at the hands of Dustin, but such is implicit in light of the evidence that the two shared a violent relationship, and we conclude the prosecutor's use of the term was a fair characterization of the evidence presented. *Compare Beat*, Webster's Third New International Dictionary 192 (unabridged ed. 2002) [hereinafter Webster's] ("to hit . . . so as to inflict pain"), *with Violence*, Webster's 2554 ("an exertion of any physical force so as to injure or abuse"). The prosecutor was "entitled to some latitude during closing argument in analyzing the evidence admitted" and was allowed to "argue the reasonable inferences and conclusions to be drawn from the evidence." *Graves*, 668 N.W.2d at 874. We find the prosecutor acted within the latitude she was entitled and defense counsel was under no duty to object and therefore did not render ineffective assistance.

B. Failure to object to violations of limine order

1. *Prior alcohol use by Kerry and Dustin*

Dustin argues his trial counsel was ineffective in failing to object to testimony concerning his and Kerry's prior alcohol usage, which he purports was in violation of the district court's limine order.

Prior to trial, Dustin filed a motion in limine requesting that evidence concerning his "use or abuse of alcohol not related to the crime for which he is charged" be inadmissible at trial. The State filed its own motion in limine, requesting that evidence concerning Kerry's "prior alcohol-related convictions" and "past history of . . . alcohol use or abuse" be excluded at trial. As to Dustin's

motion, the court ordered "the State will be allowed to present evidence that [Dustin] was drinking on the day of the incident but will not be allowed to present evidence concerning prior convictions or blood alcohol level." As to the State's request, the court ordered "the parties are allowed to illicit testimony that Kerry . . . was drinking alcohol on the date of the events at issue" but "[n]o prior instances of drinking shall be allowed to be presented."

Dustin acknowledges that, at trial, "there [was] no mention by either party about alcohol related criminal convictions," but complains "the record is replete with testimony about both Kerry and Dustin's prior alcohol use." Dustin provides us with no explanation as to how he was prejudiced by evidence concerning his and Kerry's prior alcohol use. The district court's order rendered inadmissible any evidence concerning "instances of drinking" on the part of Kerry prior to "the date of the events at issue." Assuming without deciding that the presentation of evidence concerning Kerry's prior use of alcohol was in violation of the court's limine ruling, we find Dustin was not prejudiced by such evidence. As to Dustin's prior use of alcohol, the court only expressly disallowed "evidence concerning prior convictions or blood alcohol level." The evidence complained of did not fall within this specific limitation, and was therefore not in violation of the court's limine order. As such, counsel was under no duty to object on the ground urged in this appeal and, in turn, no breach of duty occurred. *See Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996) ("[O]ur review is confined to those propositions relied upon by the appellant for reversal on appeal.").

   2.   *Kerry wanting to divorce Dustin*

Finally, Dustin argues his trial attorney was ineffective in failing to object to testimony indicating Kerry wanted to divorce him. In his motion in limine, Dustin requested the exclusion of "[a]ny evidence that [Kerry] was 'planning' to divorce" him. The district court granted the request. Dustin complains of his trial counsel's failure to object to the following testimony of a police officer at trial concerning his telephone contact with Kerry on the day of her death:

> Before I hung up with [Kerry], I asked her if she would come out and talk to me about the case that I was working with, and she said I will come out tomorrow because I've been drinking and I will tell you part of what I know because I'm still married. When I'm divorced, I will tell you the whole story.

In order to establish the prejudice prong of an ineffective-assistance claim, a defendant is required to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Upon our de novo review of the record, we answer that question in the negative.

Even if trial counsel breached a duty in failing to object, there is no reasonable probability that, but for this single, passive, and innocuous mention of a potential dissolution of Dustin and Kerry's marriage by one witness of many in the course of a trial that lasted several days the result of the proceeding would have been different—especially in light of the fact that Dustin and Kerry were already living separately. We conclude Dustin suffered no prejudice. In the alternative, it is likely trial counsel declined to object to the challenged testimony

because an objection would have drawn the jury's attention to it. *Cf. Williams*, 334 N.W.2d at 745 ("Failure to object or to move to strike certain evidence may well have been motivated by a desire not to emphasize the allegedly objectionable testimony."). Where "the challenged action 'might be considered sound trial strategy,'" there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## IV. Conclusion

We find sufficient evidence supports Dustin's conviction and trial counsel was not ineffective as alleged. We affirm Dustin's conviction of aiding and abetting murder in the first degree.

**AFFIRMED.**

Danilson, C.J., concurs; Potterfield, J., dissents.

**POTTERFIELD, Judge** (dissenting).

I disagree with my colleagues that the evidence presented by the State is sufficient to support the inferences they reach to affirm the jury's verdict of first-degree murder by aiding and abetting. "Inferences drawn from the evidence must raise a fair inference of guilt on each essential element, including the element of intent." *State v. Truesdell*, 679 N.W.2d 611, 618 (Iowa 2004). "Evidence that only raises suspicion, speculation or conjecture is not substantial." *State v. Lambert*, 612 N.W.2d 810, 813 (Iowa 2000). A conviction may not rest on speculative evidence—evidence that will support two or more reasonable inferences—that forms the fulcrum over which guilt or innocence balances. *Truesdell*, 679 N.W.2d at 618–19; *see also State v. Reed*, 875 N.W.2d 693, 711–13 (Iowa 2016) (Hecht, J., concurring specially) (cautioning against recognizing a "stack of speculative inferences piled one on top of another as substantial evidence"). The State's theory is a stack of speculative inferences and is adopted by the majority opinion.

Here, the "fulcrum" is the speculation that is the basis for the State's theory—that Dustin and Ginger argued with Kerry shortly before her death about Kerry's accusation the mother and son had sex on a gravel road.[7] In order to draw that inference, and to build upon it, the majority relies repeatedly on the case law that the jury was free to believe the evidence or the State's argument. *See State v. Thornton,* 498 N.W.2d 670, 673 (Iowa 1993) ("The jury is free to believe or

---

[7] The alternate State's argument that Ginger and Dustin became enraged during their drive because Kerry called the police about Dustin's warrant and whereabouts is based solely on speculation. The only evidence indicating even anger was Dustin's statement to law enforcement that it was Kerry who was angry before he, Ginger, and Sahara left and that Kerry threatened to call the police. The majority's reliance on a "long history of conflict" is insufficient to prove Dustin had intent or knew of Ginger's intent to kill Kerry.

disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive."). Amber's testimony that drunken and distraught Ginger said something about Kerry accusing Ginger of having sex with her son Dustin on a gravel road provides the scant support for this theory. The majority builds on this statement by Amber to conclude Ginger killed Kerry because of this accusation and that Dustin was present in the house and participated in the stabbing. Other actual evidence contradicts these inferences, and for these, the majority reminds us the jury can believe the evidence or the State's argument. *See id.* Unlike *Thornton*, where there were several pieces of evidence refuting the defendant's claim of self-defense, here there is no alternate evidence on which the jury could choose to rely. Rather, there is evidence and the State's argument about how to manipulate the evidence to support its case.

For instance, Amber also testified Ginger told her shortly after the murder, that "they" were "playing around with a knife," contradicting the notion of an argument. The majority ignores the verb "playing around with" and speculates "they" included not only Ginger and Kerry, but also Dustin. In the absence of evidence the majority bolsters its assumption Dustin and Ginger were angry about Kerry calling the police by reference to the reports of rocky relationships between Kerry and Dustin and Ginger and Kerry. The majority ignores the apparently harmonious events before Kerry became angry about Dustin's plan to take a drive.

There is evidence about the sequence of events that follows, but it does not fit the majority's inferences. First, the evidence of phone calls made by Kerry has to be manipulated so that the administrative assistant in the police department is wrong in her identification of two women's voices arguing with Kerry while the

assistant listens to Kerry's inadvertent phone call. Because there is an absence of evidence regarding individuals who may have been with Kerry while Dustin and Ginger are driving, the majority leaps to the conclusion that there is "no question" one of the voices was Ginger. Because the administrative assistant hears Kerry telling the two individuals "you're both going to jail for what you did," the State and the majority link the overheard argument among the unidentified individuals with Ginger's statement to Amber after the murder that Kerry accused her of having sex with her son Dustin on a gravel road. Despite no evidence as to with whom Kerry was arguing, other than the administrative assistant's identification of two female voices, the majority makes the leap to its inference that Kerry's statement about going to jail is directed at Ginger and Dustin for having sex together. The majority stacks the evidence from Amber, that Ginger said Kerry accused Ginger and Dustin of sleeping together, with the evidence of the phone call where Kerry is overheard saying "you're both going to jail for what you did," to infer that Dustin and Ginger were arguing with Kerry. From the argument, the majority infers Dustin knew of Ginger's intent to kill.

Second, the phone logs are a problem, since they indicate Kerry makes another, deliberate call to the police less than two minutes after the overheard argument. Kerry talked to Officer Karr and, according to the officer, asked if the police have arrested Dustin yet. That question would be strange if Dustin and Ginger were with Kerry in that small house and had just had an argument with Kerry. If Dustin and Ginger were there, having had an argument, Kerry might well have told the officer about the argument and about the presence of an enraged Ginger and Dustin. Officer Karr testified that, after asking if Dustin had been

arrested, Kerry told him Dustin was there "and won't be there long." This statement is consistent with Dustin's assertion that he waited outside for Ginger to use the restroom. Again, the majority resorts to its over-arching theory that the jury could choose to disbelieve a witness—here, Officer Karr—in favor of a theory without a basis in the evidence.

The crime scene and forensic evidence left holes, which the State—and the majority—fill with pure speculation. The majority asks us to find that Dustin must have known of Ginger's intent to kill Kerry because he had blood on him, because Ginger could not have physically overpowered Kerry without Dustin, and because the knife was found in the back yard but there was no blood on the doorknob.

The relatively small amount of blood on Dustin presents a problem for the State's case and the majority's inferences. The amount of blood on Dustin is not enough to infer he knew of Ginger's intent. If he were present and assisting in the murder of Kerry, more of Kerry's blood would have been on his person and clothing when the police saw him minutes after the event. There was a small transfer stain on the back on Dustin's shirt, two spatter stains on the top of his sandal—both less than 2 centimeters in diameter, and a drop of blood on the bottom of his sandal. In contrast, Ginger had enough blood on her that after running to Amber's house, the blood was still dripping off of her arms onto the doorframe and Amber's shirt.

The majority points to the physical size and age differences between Ginger and Kerry as evidence Dustin assisted Ginger. Because bruising was visible on Kerry's body shortly after death but not earlier in the day and the medical examiner could not say when the bruising occurred, the State argues it must have been inflicted by Dustin. The theory assumes Ginger would not have been strong

enough to subdue Kerry in the absence of expert testimony about the mechanics of the stabbing. It ignores that Kerry was found with alcohol and marijuana in her system, which may have impaired her ability to fight off Ginger. It ignores that Kerry was in a familiar place with a person she had been spending time with earlier in the day, which may have meant Kerry was willing to let Ginger get close enough to her for a surprise attack. It also ignores that Kerry was stabbed in her jugular, which would have quickly incapacitated her. The theory also ignores the evidence Kerry was stabbed on the bed, demonstrated by the errant stab into the mattress, but was found face down in another room, indicating she likely fell or was pushed to the ground after being stabbed.

The majority points to the knife found in the back yard and the lack of blood on the back door as evidence that Dustin washed his hands, then the doorknob, and then threw away the knife before reentering the car—all without any evidence the blood had been washed or wiped or that any cleaning materials were found in the house, in the yard, or in the car. Efforts to identify the source of the blood on the knife were unsuccessful.

The inferences upon which support for this murder conviction relies are stacked on top of each other without evidence. They require manipulation of the evidence that does exist and rank speculation about what may have occurred and what the jury may have imagined could have happened. The evidence here is insufficient to support the verdict. I would reverse and remand for dismissal.