# IN THE SUPREME COURT OF IOWA

No. 19–0369

Filed May 15, 2020

**STATE OF IOWA,**

Appellee,

vs.

**CHANCE RYAN BERES,**

Appellant.

---

Appeal from the Iowa District Court for Poweshiek County, Joel D. Yates, Judge.

A defendant seeks interlocutory review of the denial of his motion to dismiss, arguing that an earlier plea agreement bars the State from bringing the present charges. **DISTRICT COURT ORDER REVERSED AND CASE REMANDED.**

Vidhya K. Reddy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven, Assistant Attorney General, and Bart K. Klaver, County Attorney, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

This case gives us the opportunity to reaffirm once more that plea agreements are contracts, and accordingly, they are subject to general principles of contract law.

The plea agreement here provided that the defendant would plead guilty to his pending charge of second-degree arson, that he would cooperate in an interview regarding some other suspicious fires that had occurred, and that the State would not bring charges regarding those other fires. After the defendant pled guilty, the State changed its mind and decided it did not need or want the interview. It advised the defendant before sentencing he would be charged with other arsons and gave him an opportunity to withdraw from the plea agreement. The defendant declined to withdraw. Nonetheless, the State brought four additional arson charges. The defendant moved to dismiss them as a breach of the plea agreement. The district court denied the motion, and we granted interlocutory review.

Consistent with the law of contracts, we now hold that the State could not unilaterally withdraw from the plea agreement either by declining to conduct the interview or by making an offer of rescission that the defendant did not accept. Because the State remains bound by its plea agreement under these circumstances, we reverse the order denying the defendant's motion to dismiss and remand with directions to grant that motion.

### II. Facts and Procedural Background.

**A. Criminal Acts and Precharge Investigation.** Between January and May 2018, a number of unexplained fires occurred in and around Poweshiek County. These included a January 26 fire involving a pole barn

containing hay bales in Grinnell, an April 12 grass fire on private property in Grinnell, an April 29 grass and shed fire at the county-owned Fox Forest Wildlife Area, an April 29 nighttime grass fire in Montezuma, an April 30 early morning fire involving an abandoned two-story farmhouse at the same location, and a May 27 fire at an abandoned barn in Montezuma.

Twenty-year-old Chance Beres, a Montezuma firefighter and Grinnell paramedic, seemed to be a common denominator in these fires. Either he had reported the fire, responded to the fire, been prepared to respond to the fire, or had a combination of these types of involvement.

On or about February 20, investigator Lucas Ossman of the State Fire Marshall's Office and Deputy Steve Kivi of the Poweshiek County Sheriff's Office opened an arson investigation into the initial January 26 fire. By early April, Ossman believed some fires were being intentionally set by a firefighter. Eventually, suspicion focused specifically on Beres. Beres had recently joined the Montezuma Fire Department on April 25. He had also been working as a paramedic for Midwest Ambulance Service in Grinnell since July 2017.

On April 29 at approximately 9:41 p.m., the Montezuma Fire Department was called to a grass fire. Beres responded initially on his own and then returned with other firefighters in a different truck. A few hours later, early in the morning of April 30, Beres both reported and then responded with the Montezuma Fire Department to an abandoned farmhouse fire at the same location. Fire personnel indicated Beres had been ready to respond to the April 30 fire before everyone else and that he had made "odd comments" at the scene while responding to both the April 29 nighttime grass fire and the April 30 farmhouse fire. That same day, Kivi conducted a plain-view examination of Beres's truck and noticed accelerants and possible fire-starting materials inside.

A search warrant was obtained allowing the placement of a GPS tracker on Beres's truck. The warrant application stated a belief that Beres "has committed and is committing" arsons. It referred specifically to the April 29 and April 30 fires. The warrant application was approved, and the GPS tracker was attached to Beres's vehicle the same day.

Also on April 30, Ossman and Kivi were made aware of the earlier April 12 grass fire which had occurred in Grinnell, as well as the earlier April 29 grass and shed fire which had occurred at the county-owned Fox Forest Wildlife Area. These two fires had not initially been regarded as suspicious but were now reclassified as such. The dispatch record from the April 12 fire indicated the reporting party had seen a vehicle that could have been a match for Beres's truck.

Investigators contacted other area fire authorities, inquiring into Beres. By May 2, investigators learned that Beres had a history of "being associated with" fires, fire departments, and calls for service since the time he was approximately seventeen years old. They learned that Beres had expressed interest in working for the Malvern Fire Department but had not been accepted because of his odd behavior regarding fires and fire calls for service.

On May 11, investigators obtained a search warrant for records relating to Beres's cell phone calls and cell tower locations for January through April 2018. The search warrant application referred to a number of the fires and stated,

> Law enforcement believes Beres was involved in starting these fires, and believes that obtaining his cell phone records for these dates will show Beres was in the area of these fires near the time they would have been lit, and/or to become familiar with the area before lighting the fires, and/or to re-visit the scene.

The requested cell phone and locational records were received by investigators on May 16.

On May 27, emergency responders were called to a barn fire in Montezuma. Investigators examined the GPS tracking record for Beres's vehicle and determined Beres had been at the scene before the fire was reported. Later that evening, Beres was arrested for starting that fire.

Beres submitted to an hour-and-a-half recorded postarrest interview with Ossman and Kivi. Beres admitted he had started the May 27 Montezuma barn fire and the April 12 grass fire. He stated that he had tried but failed to set fire to the wildlife conservation area the day before the April 29 fire occurred at that location. He said he might have "accidentally" started the April 29 nighttime grass fire in Montezuma by flicking a lit cigarette. Additionally, while he denied starting the April 30 fire at the same location, he admitted he saw and reported it, claiming this was "a fluke." Beres also admitted he was at the scene of the January 26 fire and had parked there about ten to fifteen minutes and reported that fire, even though he denied setting it. Beres also admitted to starting a number of other fires, including one in Boone County.

On June 1, Beres's time card records were subpoenaed from Midwest Ambulance Service. The time card records, produced on July 1, appeared to indicate Beres had responded with Midwest Ambulance to several of the fires, including the January 26 and the April 12 fires.

**B. Charge and Plea in Poweshiek County Case No. FECR010796—the May 27 Montezuma Barn Fire.** On June 5, the State charged Beres by trial information in Poweshiek County Case No. FECR010796 with arson in the second degree, a class "C" felony. *See* Iowa Code § 712.3 (2018). The charge related to the May 27 Montezuma barn fire.

On June 29, the parties notified the court that they had reached a plea agreement. A plea hearing was held before the district court on July 9. As required by Iowa Rules of Criminal Procedure 2.8 and 2.10, the parties' plea agreement was put on the record and was confirmed by defense counsel, the defendant, and the prosecutor as follows:

> THE COURT:  What is the plea agreement in the case?
>
> MR. STIEFEL: The plea agreement to my understanding, Your Honor, is in exchange for Mr. Beres'[s] guilty plea today, at the sentencing hearing, both parties will have the option of arguing for whatever sentence they think is appropriate.
>
> And at least on Mr. Beres'[s] behalf, that would include the ability to argue for a deferred judgment.
>
> It's a further provision of the plea agreement that if Mr. Beres successful[ly] enters his guilty plea today, that the State and the defendant would both request that he be released from jail under the pretrial supervision of the 8th Judicial District Department of Correctional Services.
>
> And it is the further provision of the plea agreement that Mr. Beres agrees to cooperate with an interview with the Poweshiek County Sheriff's Office regarding the incident and other potential incidents that led to his current criminal charges, and that if Mr. Beres cooperates with the interview and is truthful to the satisfaction of the sheriff's department in the interview, that the State will file no further charges against Mr. Beres for any alleged incidents that may have occurred prior to his date of incarceration in this case.
>
> THE COURT:  Mr. Beres, is that your understanding of the plea agreement?
>
> MR. BERES:  Yes, Your Honor.
>
> THE COURT:  Mr. Klaver, is that your understanding of the plea agreement?
>
> MR. KLAVER:  It is, Your Honor.
>
> THE COURT: And, Mr. Beres, you understand that the sentencing judge, whoever that may be, will ultimately decide what your sentence is?
>
> MR. BERES: Yes, Your Honor.

THE COURT: Have any threats or promises, other than the plea agreement, been made to get you to plead guilty?

MR. BERES: No, Your Honor.

The district court accepted Beres's plea of guilty to arson in the second degree for the May 27 fire. As contemplated in the plea agreement, Beres was immediately released under supervision, pending sentencing, which was scheduled for October 1 at 10:30 a.m.

Between June 29 and October 1, no representative of the State or the sheriff's office contacted Beres or his attorney to arrange an interview. Having not heard anything from the State, defense counsel called and left voicemails for Kivi on September 24 and September 28 inquiring into the interview scheduling. The calls went unanswered.

After receiving defense counsel's voicemails, Kivi informed the county attorney's office "that the investigations into the suspicious fires had been concluded and that an interview of the defendant would not serve any purpose." At 8:53 a.m. on October 1, about an hour-and-a-half prior to the sentencing hearing, the county attorney sent an email to defense counsel stating as follows:

> I wanted to let you know in advance of the hearing that Chance Beres is likely going to be getting additional charges. I spoke with [Kivi] Friday and then we are scheduled to meet Tuesday along with the fire marshal (Kivi is off today). I didn't want to spring this on you because it is late in the process, however, the entire purpose of the "plea bargain" if it can even be called that, was to aid in the investigation. It would appear that the investigation is concluded and so there is nothing Mr. Beres['s] interview would do to assist at this point.

In informal discussions just before the sentencing hearing, the county attorney reiterated to defense counsel that "additional charges against the defendant would likely be filed" and that "he was considering filing additional charges." At the same time, the county attorney suggested that if Beres then wanted to withdraw his prior guilty plea, the State would

not object and would, in fact, support such a withdrawal. Beres declined to withdraw his guilty plea, indicating that he remained willing to participate in an interview regarding the uncharged arsons.

The matter proceeded to sentencing. Neither party raised a possible breach or modification of the plea agreement. A presentence investigation (PSI) report had been completed and was available to the court and the parties at sentencing. The PSI report discussed Beres's alleged involvement in setting other fires.

Defense counsel objected to the court's consideration of unproved allegations relating to other fires, and the county attorney agreed they should not be considered. The district court indicated it would not consider the allegations, treating them as deleted from the PSI report. The court then inquired into the parties' recommendations for Beres's sentence. Beres and his attorney argued for a deferred judgment, while the State argued for imposition of a ten-year prison sentence. The sentencing court ultimately sided with Beres, entered a deferred judgment, and placed Beres on five years of probation.

**C. Subsequent Charges in Poweshiek County Case No. FECR010833—Earlier Fires.** On November 9, about a month after Beres was sentenced on his plea to the May 27 fire in Case No. FECR010796, the State charged Beres in Poweshiek County Case No. FECR010833 with four additional counts of arson. This is the case in which the present appeal is taken. The four counts involved the January 26 pole barn fire (count I), the April 30 abandoned farmhouse fire (count II), the April 29 fire at the county-owned Fox Forest Wildlife Area (count III), and the April 12 grass fire on private property (count IV). Three of the counts were for arson in the second degree, a class "C" felony, *see*

Iowa Code § 712.3; the remaining count was for arson in the third degree, an aggravated misdemeanor, *see id.* § 712.4.

On December 29, Beres moved to dismiss these charges, arguing that the State's bringing charges for pre-May 27 conduct violated the earlier plea agreement. The State resisted, urging the motion to dismiss should be denied because

> [t]he State did not breach any plea agreement, specifically the agreement to refrain from filing any new charges against the defendant was contingent upon the defendant providing an interview to the investigators' satisfaction. The condition precedent . . . never occurred, and therefore, the State was not bound under the agreement to refrain from filing new charges.

An evidentiary hearing on the motion to dismiss was held on February 4, 2019. Beres testified that he had never refused to cooperate in an interview, had never been contacted by any State representative regarding an interview, had never done anything to hinder the State in conducting an interview, and was still willing at the time of the hearing to provide an interview. Beres did, however, admit that he knew at the time of his sentencing in Case No. FECR010796 about the State's potential plan to file charges relating to other fires.

Kivi testified on behalf of the State, acknowledging that he had never attempted to contact Beres following the July 9, 2018 plea hearing and that he also never responded to the voice messages left by Beres's counsel on September 24 and September 28, 2018. Kivi explained that the State "decided to forego the interview" with Beres because

> we -- in mid-September -- Well, for one thing, we received some information that was, quite frankly, very damning to Mr. Beres as a suspect in these other fires.
>
> We thought if -- at that point, if we do interview him and we didn't charge him with the fires -- Basically, we got new information that we thought was strong enough to -- that we

didn't need to interview him anymore that we didn't have earlier.

> Not to mention that he had quite, I don't know, a few months, I guess, or quite -- quite some time to -- to approach us, and we wanted to interview him before his sentencing hearing. I was contacted a couple days or a few days before, which would have left us not nearly enough time to verify whatever he would tell us, corroborate anything he would say.

This "damning" evidence was not specified. Kivi also emphasized that the sheriff's office had been tied up with the unrelated investigation into a notorious case involving a University of Iowa student who had disappeared in July 2018 and was later found to have been killed.

Later that same day, the district court issued a written ruling denying Beres's motion to dismiss. The court's ruling stated, in pertinent part,

> On or about July 9, 2018, this Defendant tendered a plea of guilty in companion case number FECR010796. On that date, sentencing was set for October 1, 2018. The State and Defendant discussed the possibility of the Defendant being interviewed prior to sentencing about his involvement in other potential crimes. The interview never happened.

> The State says they obtained additional, new information linking this Defendant to additional crimes, therefore negating the need for the interview. The Defendant claims he reached out to the State regarding the interview, but acknowledges that it was close to the sentencing date. Regardless, the Defendant and Defendant's counsel were notified of potential new charges prior to the sentencing date.

> Despite the awareness of additional charges, the Defendant voluntarily went fo[r]ward with the sentencing hearing. The Defendant did not seek a continuance or withdrawal of his plea of guilty, nor did the Defendant lodge any type of objection.

> For all of the reasons set forth in the State's Resistance, the Court finds the Defendant's Motion to Dismiss should be and is hereby DENIED.

**D. This Appeal.** On March 6, 2019, Beres filed an application for interlocutory appeal, challenging the district court's denial of his motion

to dismiss. On March 21, we issued an order granting Beres's application and staying further district court proceedings.

We retained the appeal.

### III. Standard of Review.

> When faced with a motion to dismiss as a sanction for the State's alleged repudiation of a plea agreement, the district court has the same limited discretion it has "when ruling on a motion to dismiss for failure to provide a speedy trial under Iowa Rule of Criminal Procedure [2.33(2)]."

*State v. Dudley*, 856 N.W.2d 668, 675 (Iowa 2014) (alteration in original) (quoting *State v. Hovind*, 431 N.W.2d 366, 368 (Iowa 1988)). "If the district court abused its limited discretion by finding the State did not repudiate the plea agreement, we will reverse its finding." *Id.*

### IV. Analysis.

**A. The Legal Framework Underlying Plea Bargains.** "Plea bargains are akin to contracts." *State v. Macke*, 933 N.W.2d 226, 238 (Iowa 2019) (Mansfield, J., concurring in part and dissenting in part); *see also Rhoades v. State*, 880 N.W.2d 431, 449 (Iowa 2016) ("A plea bargain also may be regarded as a contract where both sides ordinarily obtain a benefit."). "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration [for the plea], such promise must be fulfilled." *State v. Lopez*, 872 N.W.2d 159, 170 (Iowa 2015) (second alteration in original) (quoting *Santobello v. New York*, 404 U.S. 257, 262, 92 S. Ct. 495, 499 (1971)). A "prosecutor's obligation to scrupulously comply with the letter and spirit of the agreements" means that even technical compliance will not suffice if the prosecutor otherwise "undercut[s] the plea agreement." *Id.* at 173.

We have "recogniz[ed] the important role plea agreements play in our scheme of justice and the concomitant need for strict compliance with those agreements." *State v. Bearse*, 748 N.W.2d 211, 215 (Iowa 2008). For this reason, Iowa courts "are compelled to hold prosecutors and courts to the most meticulous standards of both promise and performance." *Id.* (quoting *State v. Horness*, 600 N.W.2d 294, 298 (Iowa 1999)). Accordingly, " 'violations of either the terms or the spirit of the agreement' require reversal of the conviction or vacation of the sentence." *Id.* (quoting *Horness*, 600 N.W.2d at 298).

Here the plea agreement incorporated a promise of immunity: Beres would not be charged with other arsons if he cooperated in an interview with the State. The State does not dispute that it *did* charge Beres with additional arsons. However, it claims that it did not breach the plea agreement because the interview never happened. It also argues it could withdraw from the agreement because additional damaging information about Beres came to light after it had entered into the agreement. Lastly, it maintains that it did not breach because it gave Beres the opportunity to rescind the plea agreement and go back to square one. We will address these contentions in order.

**B. Did Beres's Failure to Be Interviewed Mean that the Plea Agreement Was No Longer Binding?** Conceding that the plea agreement is a contract, the State argues that its obligation not to bring additional arson charges was conditioned on Beres's participation in an interview. Because Beres was not interviewed, its covenant not to bring other charges went away.

We disagree. Restatement (Second) of Contracts section 245 provides, "Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the

non-occurrence is excused." Restatement (Second) of Contracts § 245, at 258 (Am. Law Inst. 1981). Comment *a* to section 245 elaborates,

> Where a duty of one party is subject to the occurrence of a condition, the additional duty of good faith and fair dealing imposed on him under § 205 may require some cooperation on his part, either by refraining from conduct that will prevent or hinder the occurrence of that condition or by taking affirmative steps to cause its occurrence. Under § 235(2), non-performance of that duty when performance is due is a breach. See Illustration 3 to § 235. Under this Section it has the further effect of excusing the non-occurrence of the condition itself, so that performance of the duty that was originally subject to its occurrence can become due in spite of its non-occurrence.

*Id.* cmt. *a.* *Corbin on Contracts* puts it succinctly, "One who unjustly prevents the performance or the happening of a condition of promissory duty thereby eliminates it as a condition." 8 Catherine M.A. McCauliff, *Corbin on Contracts* § 40.17, at 580 (Joseph M. Perillo ed., rev. ed. 1999).

An interview takes two to tango. Having refused to cooperate in the scheduling or taking of an interview of Beres—indeed, the State frankly stated that it "didn't need to interview him anymore"—the State can't use the lack of an interview as grounds for backing out of the agreement. As the late Chief Justice Cady noted when he was serving on the court of appeals, "[I]f one party to a contract prevents the other from performing a condition or fails to cooperate to allow the condition to be satisfied, the other party is excused from showing compliance with the condition." *Emp. Benefits Plus, Inc. v. Des Moines Gen. Hosp.*, 535 N.W.2d 149, 155 (Iowa Ct. App. 1995).

The interview was for the benefit of the State. *See Rhoades*, 880 N.W.2d at 449 ("A plea bargain also may be regarded as a contract where both sides ordinarily obtain a benefit."). The record makes clear that the State was no longer interested in the interview. It never sought to arrange

the interview, even when Beres's counsel reminded the prosecutor in a voicemail message a week before sentencing. In fact, at the motion to dismiss hearing, Kivi acknowledged discussing counsel's voicemail with the county attorney and "decid[ing] to forego the interview." The State cannot use the failure of the interview to occur as a reason to withdraw from the plea agreement.

**C. Did the State Discover New Evidence that Relieved It of Its Obligation to Perform the Plea Agreement?** The State maintains that the sheriff's department gained additional incriminating evidence after the guilty plea hearing tying Beres to the prior arsons. The State therefore asserts it could avoid the plea agreement under standard contract principles. It is noteworthy that the State did not identify this additional evidence at the hearing below.

On appeal, the State tries to fill that gap with one item. It argues that cell phone tracking data placing Beres in the wildlife conservation area on April 29 had not been "analyzed" as of July 9, 2018—the date of the guilty plea hearing. Giving the State every benefit of the doubt, it is possible to read the record as indicating that although the State *had* the data, it did not *realize* by July 9 that the data placed Beres in the vicinity of the wildlife conservation area at the time of that fire.

This seems like a very fine point. Beres had already admitted to intentionally setting a fire in the wildlife conservation area—merely claiming he had done it the day before it actually occurred (i.e., April 28). Even assuming the State lacked one piece to the puzzle—or more accurately, hadn't noticed that piece—the State concedes it had all the other pertinent evidence of Beres's involvement in the fires as of Beres's plea hearing on July 9. In reality, the State learned little new before it decided to back out of the plea agreement shortly before the October 1

sentencing. The State's protests that it only "assembled" the information into a "narrative" later on ring hollow. The summary of Beres's May 27 postarrest interview demonstrates that the State already had put together a narrative by then.

In contract law terms, the State is trying to argue frustration of purpose. The Restatement (Second) of Contracts provides guidance as follows:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 265, at 334–35. The classic case is *Krell v. Henry*, where a renter's obligation to rent a flat for two days to view the King's coronation was discharged because the King developed appendicitis and the coronation was postponed. *Krell v. Henry* [1903] 2 KB 740 (Eng.).

Under this framework, the State's contractual obligation is discharged only if three requirements are met:

> First, the purpose that is frustrated must have been a principal purpose of that party in making the contract. It is not enough that he had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made. . . . The foreseeability of the event is . . . a factor in that determination, but the mere fact that the event was foreseeable does not compel the conclusion that its non-occurrence was not such a basic assumption.

Restatement (Second) of Contracts § 265 cmt. *a*, at 335. We have indicated that the new event must render the agreement virtually worthless to the party seeking to withdraw. *See Mel Frank Tool & Supply, Inc. v. Di–Chem Co.*, 580 N.W.2d 802, 806 (Iowa 1998) ("The rule deals with the problem that arises when a change in circumstances makes one party's performance virtually worthless to the other, frustrating the purpose in making the contract.").

Other courts have applied frustration-of-purpose analysis in determining whether withdrawal from a plea agreement is permissible based on an intervening development. In *United States v. Frownfelter*, 626 F.3d 549, 554 (10th Cir. 2010), the United States Court of Appeals for the Tenth Circuit refused to invalidate a plea agreement based on frustration of purpose when the defendant unexpectedly was able to reduce the felony charge to which he had pled guilty to a misdemeanor. The court acknowledged that a plea agreement could be invalidated if the three-part Restatement test had been met. *Id.* Yet it found that the test had not been satisfied for several reasons. *Id.* Among other things, the court observed, "If the United States considered the felony/misdemeanor distinction so material, it is unclear why it did not exercise greater care in drafting the indictment and plea agreement." *Id.* at 555. The court added that the intervening event had been "a risk assumed by the government," and the court could not declare that the agreement made "little sense" with only a misdemeanor conviction. *Id.*

Here the State cannot point to a new event that altered the landscape. In fact, the State had the bulk—if not all—of its incriminating evidence concerning Beres at the time it entered into the plea deal. To the extent the State was still waiting for cell phone data to be analyzed, it would have known what it didn't yet know. All of the charged arson counts

in this case involved crimes that Beres was already suspected of—and as to which there was considerable incriminating evidence—at the time of the July 9 plea hearing.

In other words, the State had basically the same "damning" evidence on July 9 that it had on October 1. *See Lopez*, 872 N.W.2d at 180 ("If the prosecutor believes incarceration is appropriate, the State should not enter into a plea agreement to recommend probation."). Furthermore, if the State wanted to protect itself, it could have reserved the right to withdraw from the agreement if additional adverse information came to light before sentencing, something it did not do. We find that frustration of purpose does not apply here.

**D. Did Beres Ratify the State's Modification of the Plea Agreement by Refusing the State's Offer of Rescission?** Lastly, the State maintains that Beres ratified its unilateral modification of the plea agreement by refusing the State's offer to withdraw from the agreement and start over. We disagree with the State here as well.

In the first place, the State's modification left Beres with a deal that was no deal at all. In the State's world, Beres would be pleading to the trial information in Case No. FECR010796 while receiving nothing in return. Beres would be getting no concession on charging, sentencing, or sentencing recommendation.

Second, it is a basic precept of contract law that one side is not free to unilaterally withdraw and go back to the beginning just because it wants to do so. "[T]he State may withdraw from a plea bargain at any time prior to, but not after, actual entry of the guilty plea by defendant . . . ." *State v. Weig*, 285 N.W.2d 19, 21 (Iowa 1979) (quoting *State v. Edwards*, 279 N.W.2d 9, 11 (Iowa 1979)); *see also State v. King*, 576 N.W.2d 369, 370 (Iowa 1998) (en banc) (per curiam) ("This court has recognized that a

prosecutor may not withdraw from a plea bargain after a defendant has entered a guilty plea or has detrimentally relied upon the agreement.").

Nor do we agree that Beres ratified anything. True, in an email shortly before sentencing, the prosecutor indicated that Beres was "likely going to be getting additional charges." In addition, Beres was told he could move to withdraw from the plea agreement and the State would not oppose his motion.

But Beres's failure to respond to the State's offer to rescind the plea agreement does not amount to a ratification of the State's breach of that agreement. At that point, the State had not *actually breached* the agreement by filing more charges. When it did, Beres moved to dismiss them. *See Berryhill v. Hatt*, 428 N.W.2d 647, 655 (Iowa 1988) ("With an anticipatory breach, the nonbreaching party may consider the contract breached and sue immediately, or await the time of performance and then upon failure of performance hold the breaching party responsible for the consequences of nonperformance."); *Glass v. Minn. Protective Life Ins.*, 314 N.W.2d 393, 396–97 (Iowa 1982) ("A renunciation authorizes but does not require the nondefaulting party to treat the contract as broken.").

Moreover, the October 1 sentencing proceeding that followed the informal exchange between the county attorney and Beres's counsel was totally silent as to the possibility that the existing plea agreement was being changed. That plea agreement had been memorialized in an in-court colloquy on July 9. Just as the original plea agreement had to be put on the record, so too with any revised agreement. *See* Iowa R. Crim. P. 2.8(2)(*c*); *id.* r. 2.10(2). "The record of the proceedings in open court controls our analysis, not any off-the-record side deals." *Macke*, 933 N.W.2d at 237 (majority opinion). Yet the State said nothing on the subject at sentencing.

Although the circumstances are somewhat different, this case calls to mind another case where we barred the State from bringing a charge it had agreed not to bring:

> Apparently the county attorney entered into the instantly involved plea bargain and attendant agreement in all good faith but for some reason changed his mind while en route to the court house. In any event the bargain made was breached by the State. Under existing circumstances such is nothing less than an intolerable violation of our time-honored fair play norm, and accepted professional standards.

*State v. Kuchenreuther*, 218 N.W.2d 621, 624 (Iowa 1974).

When the State breaches the plea agreement, the defendant who requests such a remedy is generally entitled to specific performance. *See Macke*, 933 N.W.2d at 228; *State v. Fannon*, 799 N.W.2d 515, 524 (Iowa 2011); *Bearse*, 748 N.W.2d at 218; *State v. Carrillo*, 597 N.W.2d 497, 500–01 (Iowa 1999) (per curiam). "If the district court determines that [the defendant] did not breach the cooperation agreement, fundamental fairness requires the government to uphold its part of the agreement and the district court may enforce the agreement by dismissing the indictment." *United States v. Brown*, 801 F.2d 352, 355 (8th Cir. 1986). Accordingly, we grant specific performance here and reverse the denial of Beres's motion to dismiss. We remand for dismissal of the trial information in this case.

**V. Conclusion.**

For the foregoing reasons, we reverse the district court's order and remand with directions to grant Beres's motion to dismiss.

**DISTRICT COURT ORDER REVERSED AND CASE REMANDED.**

All justices concur, and Appel, J., files a separate concurring opinion.

**APPEL, Justice (concurring specially).**

I join the majority opinion, as I concur in the result in this case and in much of the reasoning of the majority opinion. In my view, however, there are additional points that should be made.

First, although contract analysis is often helpful in the context of plea bargaining, particularly in analyzing whether a breach has occurred, it is not the be-all and end-all within the context of a plea bargain. Unlike a private commercial transaction, the plea-bargaining process invokes criminal justice sanctions and obviously has procedural and substantive due process implications.

Thus, a plea bargain is not a mere contract but is a constitutional contract. While defendants are at least entitled to the protection of ordinary contracts, they may be entitled additional protections not afforded by contract law. As noted by Justice Brennan,

> This Court has yet to address in any comprehensive way the rules of construction appropriate for disputes involving plea agreements. Nevertheless, it seems clear that the law of commercial contract may in some cases prove useful as an analogy or point of departure in construing a plea agreement, or in framing the terms of the debate. It is also clear, however, that commercial contract law can do no more than this, because plea agreements are constitutional contracts. The values that underlie commercial contract law, and that govern the relations between economic actors, are not coextensive with those that underlie the Due Process Clause, and that govern relations between criminal defendants and the State. Unlike some commercial contracts, plea agreements must be construed in light of the rights and obligations created by the Constitution.

*Ricketts v. Adamson*, 483 U.S. 1, 16, 107 S. Ct. 2680, 2689 (1987) (Brennan, J., dissenting) (citation omitted). Justice Brennan's

observations apply with equal force to rights and obligations created by the Iowa Constitution.

By way of example, due process concerns surround the plea-bargaining waiver process, including the requirement that waiver be knowing and voluntary. *See, e.g.*, *Santobello v. New York*, 404 U.S. 257, 261, 92 S. Ct. 495, 498 (1971); *Brady v. United States*, 397 U.S. 742, 748, 90 S. Ct. 1463, 1468–69 (1970). *See generally* Russell D. Covey, *Plea-Bargaining Law After* Lafler *and* Frye, 51 Duq. L. Rev. 595 (2013) (exploring broadly the procedural protections around the plea-bargaining process for defendants). And, as shortcomings in our criminal justice system and the plea-bargaining process are revealed by DNA exonerations and other showings of actual innocence, the due process concept of actual innocence has taken hold.

The concept that actual innocence matters where a defendant has pled guilty is rooted in the law of due process under the Iowa Constitution, and not the law of contract. *See Schmidt v. State*, 909 N.W.2d 778, 793–95 (Iowa 2018) (finding that "the Iowa Constitution permits freestanding post-conviction claims of actual innocence" under article I, sections 9 and 17). Further, there is substantial authority for the proposition that due process is violated when the prosecution negotiates a plea bargain without disclosure of *Brady* material. *See* Daniel Conte, Note, *Swept Under the Rug: The* Brady *Disclosure Obligation in a Pre-Plea Context*, 17 Suffolk J. Trial & App. Advoc. 74, 80–82 (2012) (discussing the ethical duties of prosecutors under ABA Model Rule of Processional Conduct 3.8(d) in discovery). *See generally* Colin Miller, *The Right to Evidence of Innocence Before Pleading Guilty*, 53 U.C. Davis L. Rev. 271 (2019) (surveying caselaw leading to the evidentiary disclosure requirements in *Brady*, as well as developments in federal disclosure requirements post-*Brady*).

While ordinary contract analysis can be useful in the plea-bargaining context, and is often dispositive, it is not necessarily determinative in every case involving a plea bargain. *See generally* Colin Miller, *Plea Agreements as Constitutional Contracts*, 97 N.C. L. Rev. 31 (2018) [hereinafter Miller, *Plea Agreements*] (examining plea agreements under the framework of constitutional contracts, arguing that plea bargains have all the protections of contract law, and suggesting reforms to bolster protections for defendants within the plea-bargaining context).

In addition, there is caselaw suggesting that due process requires more than ordinary contract law in other plea-bargaining contexts. *See, e.g.*, *United States v. Newbert*, 504 F.3d 180, 187 (1st Cir. 2007) ("[T]he analogy between plea agreements and commercial contracts is not exact, and the parties do not necessarily bear equal obligations."); *In re Grand Jury Witness Altro*, 180 F.3d 372, 375 (2d Cir. 1999) ("Our concern for fairness is rooted in an appreciation of the fact that, unlike ordinary contracts, plea agreements call for defendants to waive fundamental constitutional rights, and in an awareness that the Government generally drafts the agreement and enjoys significant advantages in bargaining power."); *Plaster v. United States*, 720 F.2d 340, 352 (4th Cir. 1983) ("[P]rinciples of contract law, which implicate entirely different concerns of economic efficiency in a situation involving equally strong parties, may not properly be applicable to the prosecutor-defendant agreement context. Indeed, we note[] that fundamental fairness under . . . specific circumstances . . . require[] enforcement of the [plea] agreement despite its not having been accepted under principles of contract law." (Footnote omitted.)); *State v. Rivest*, 316 N.W.2d 395, 407 (Wis. 1982) (noting that plea agreements consider not just contract law, but also include "considerations of due process" and "considerations of the sound and

effective administration of the criminal justice system"); *see also* Miller, *Plea Agreements*, 97 N.C. L. Rev. at 42–43 (noting that "courts have mostly treated criminal defendants the same as or better than parties to normal contracts" and noting also that "[l]ower courts have also, in some cases, refused to import specific commercial contract law doctrines into plea bargaining").

Further, an emerging rule of interpretation dictates that plea bargains should be construed against the government, with ambiguities in the plea agreement to be construed against the state. *See, e.g., United States v. Gebbie,* 294 F.3d 540, 551–52 (3d Cir. 2002) ("When we interpret ambiguous plea agreements and extrinsic evidence does not resolve the ambiguity, then we construe the ambiguity against the drafter. Because of the Government's advantage in bargaining power, we, and numerous other courts of appeals, construe ambiguities in plea agreements against the Government."); *United States v. Harvey*, 791 F.2d 294, 303 (4th Cir. 1986) ("Having concluded that the disputed provision was ambiguous in the respect found dispositive by the district court, we further conclude that under the plea bargaining principles above stated the provision must be read against the Government."); *State v. Bisson,* 130 P.3d 820, 825 (Wash. 2006) (en banc) (affirming that in cases of illegal plea terms, or lack of informed consent by defendant to terms of plea, defendant may decide whether to enforce or withdraw the plea bargain); *see also Guilty Pleas*, 33 Geo. L.J. Ann. Rev. Crim. Proc. 363, 379 n.1313 (2004) (cataloguing federal cases in which ambiguities in plea agreements are construed against the state). To the extent the prosecution seeks to creatively exploit ambiguous terms in the plea bargain, it has no prospect of success under the prevailing caselaw.

Finally, plea bargains are generally thought to be subject to a duty of good faith and fair dealing. *See, e.g., Cole v. State*, 922 A.2d 354, 359 (Del. 2005) ("[I]n Delaware, a covenant of good faith and fair dealing applies to plea bargains as well as to any agreement between a criminal defendant and the State."); *State v. Williams*, 11 P.3d 878, 880 (Wash. Ct. App. 2000) ("Plea agreements are contracts, and the law imposes upon the State an implied promise to act in good faith."); *State v. Scott*, 602 N.W.2d 296, 302 (Wis. Ct. App. 1999) ("[T]he State was obliged to act in good faith and adhere to the bargain it had struck with [the defendant]. After the contract had been negotiated and [the defendant's] no contest pleas entered, neither party had the right to renege on the agreement."); *see also* Miller, *Plea Agreements*, 97 N.C. L. Rev. at 49–89 (outlining thoroughly in section III of the article the implied covenant of good faith and fair dealing within the context of plea agreements, and citing supporting caselaw throughout). Among other things, good faith and fair dealing mean that the state cannot take action that prevents the defendant from performing under a plea bargain, and that is exactly what happened in this case. The majority rightly refuses to permit the prosecution in this case from preventing the defendant's performance. I understand that nothing in the majority opinion is inconsistent with the above propositions, and I therefore concur in the majority opinion.